2000 SD 85

**Audra K. MARTINMAAS, n/k/a Audra Martinmaas Sparks, Plaintiff and Appellee,**

v.

**Gary ENGELMANN, Defendant and Appellant.**

**Nancy and Greg Froning, Plaintiffs and Appellees,**

v.

**Gary Engelmann, Defendant and Appellant.**

**Natalie and Brian Bertsch, Plaintiffs and Appellees,**

v.

**Gary Engelmann, Defendant and Appellant.**

**Nos. 20953–20955.**

Supreme Court of South Dakota.

Argued Jan. 13, 2000.

Decided June 28, 2000.

See also, 541 N.W.2d 96.

the definition of malpractice. We also see no error in the consolidation of these actions, in permitting access to hearing transcripts on defendant's application for re-issuance of a medical license, or in permitting comments that defendant was no longer a physician.

## FACTS

[¶ 2.] This appeal involves former physician Gary Engelmann of Miller, South Dakota. On July 1, 1994, while Engelmann was conducting a pelvic examination, the patient[1] allegedly sat up and noticed his exposed penis. She ran from the examination room and later filed rape charges, claiming Engelmann had inserted his penis inside her vagina during the examination. Soon after this incident, other alleged victims came forward with similar stories. Included among them were Audra Martinmaas, Natalie Bertsch and Nancy Froning. [hereinafter Martinmaas, Bertsch, Froning, or collectively, "Plaintiffs"]

[¶ 3.] Engelmann denied the rape allegations. He originally entered an *Alford* plea (whereby he pled guilty while maintaining his innocence) to the charges, but later withdrew it.[2] After the rape charges were initiated, Engelmann voluntarily surrendered his medical license. He went to trial and was acquitted. After his acquittal, Engelmann sought to have his medical license returned. The South Dakota Board of Medical and Osteopathic Examiners refused, stating that certain gynecological examinations performed by Engelmann were performed in a manner constituting "gross incompetence" and "unprofessional conduct."

[¶ 4.] In addition to the criminal charges stemming from Engelmann's actions, Martinmaas, Bertsch, and Froning each filed separate civil suits. Finding common factual and legal issues among the cases, the trial court consolidated them for trial.

A. Russell Janklow, Ronald A. Parsons, Jr. of Johnson, Heidepriem, Miner, Marlow, and Janklow, Sioux Falls, SD, and Sheila S. Woodward of Johnson, Heidepriem, Miner, Marlow, and Janklow, Yankton, SD, Attorneys for plaintiffs and appellees.

Reed Rasmussen of Siegel, Barnett and Schutz, Aberdeen, SD, Attorneys for defendant and appellant.

MILLER, Chief Justice.

[¶ 1.] In this appeal we affirm jury verdicts in three consolidated medical malpractice actions against a former physician. We hold that for tort liability purposes, sexual misconduct falls within

---

1. That alleged victim is not a party to this civil proceeding.

2. In *State v. Engelmann,* 541 N.W.2d 96 (S.D. 1995), we reversed the judge's refusal to allow the withdrawal of the guilty plea.

The complaints originally filed alleged both negligence and intentional torts. However, the intentional tort allegations were dropped prior to trial, and the trial proceeded only on claims of professional negligence and negligent infliction of emotional distress. The negligence claims were based on two separate theories: utilization of improper positions, procedures, and methods, and engaging in improper and inappropriate sexual contact. The individual facts of each case are presented as follows:

[¶ 5.] *Bertsch.* Bertsch saw Engelmann for a gynecological exam on February 28, 1994. She testified that during the examination, Engelmann told her he was going to use a procedure called a uterine massage in order to obtain a sample of some suspicious discharge. This procedure allegedly involved the insertion of some gauze into her vagina along with some massaging back and forth, both externally on her lower abdomen and inside her vagina. Bertsch claimed that the procedure lasted three to four minutes, and during that time she felt an in-and-out motion, as if she were having sex. She also noticed Engelmann's breathing was irregular and his eyes were glassy. She related the experience to her husband immediately after the exam.

[¶ 6.] The next day, Bertsch told a female co-worker about the incident. The co-worker told Bertsch that she had the same experience during a gynecological exam by Engelmann. Shortly thereafter, Bertsch learned she was pregnant. Fearing Engelmann might be the father of the child, she and her husband arranged for a paternity test, which confirmed that Bertsch's husband was the child's father. Other than her husband and the co-worker, Bertsch did not discuss this incident with anyone until she spoke to another doctor at the clinic on July 11, 1994, and to law enforcement on July 27, 1994.

[¶ 7.] As a result of this incident, Bertsch claimed to have experienced significant anxiety and emotional distress. Between May 1995 and May 1997, she attended nine professional counseling sessions. According to her husband, the incident had a negative effect on their marriage.

[¶ 8.] Engelmann denied ever having inserted his penis into Bertsch's vagina. He claimed that because of the nature of Bertsch's exam, he did not intend to insert a speculum. However, after Bertsch allegedly expressed concern over some discharge, he decided to obtain a sample. Engelmann claimed he used a piece of gauze to obtain the sample, rather than inserting the speculum, because he believed the instrument was uncomfortable for his patients.

[¶ 9.] *Martinmaas.* Martinmaas' alleged inappropriate examination took place on January 20, 1994. According to her testimony, Engelmann told her that he needed to conduct a uterine massage with a piece of gauze in order to collect a sample of discharge discovered during the exam. She claims that while he was collecting the sample, which took approximately two to three minutes, she felt him moving back and forth and believed he was having sex with her. She later told her boyfriend and her mother of her belief, but told no one else until reporting it to law enforcement on August 30, 1994.

[¶ 10.] As a result of this incident, she claimed to have experienced nightmares, depression and paranoia. She received counseling in early 1995 and again from October 1996 to October 1998. In addition to the psychological effects she suffered, Martinmaas reportedly felt very uncomfortable in Miller because of the town's reaction to the entire incident. As a result, her wedding was held in another town.

[¶ 11.] Engelmann could not recall whether he had used the "gauze procedure" on Martinmaas, but denied ever inserting his penis inside her. Engelmann later acknowledged the "gauze procedure" was one he made up. He had never seen

anyone perform it, it was not taught in medical school, nor had he ever read about it in any medical literature.

[¶ 12.] Two physicians called as expert witnesses also testified to the dubiousness of the gauze procedure. One testified that he was familiar with the "uterine massage" procedure, but had only used it to stop unusually heavy hemorrhaging after the delivery of a baby when a woman's uterus failed to tighten. Furthermore, the physician said he had never heard of using gauze to collect a sample from the vagina. Such a procedure would not only be uncomfortable to the patient, but any attempt to alleviate the discomfort by applying lubricant to the gauze or the fingers would contaminate the sample. In the physician's opinion, such a method of collecting a sample would fall below the appropriate standard of care. The other physician corroborated the first physician's testimony, adding that any procedure to collect a sample which lasted three to four minutes would fall below the standard of care, especially when combined with the questionable "gauze procedure."

[¶ 13.] *Froning.* Engelmann performed pelvic exams on Froning on two occasions, November 9 and December 13, 1993. In order to facilitate the exam, he asked her to assume a position on her hands and knees, called the knee-chest position. In this position, her "rear end" stuck up in the air and her gown fell down over her shoulders leaving her essentially naked. The use of this unusual procedure was not documented in Froning's medical records. She claims that being examined in the knee-chest position was unnecessary and caused her extreme embarrassment and humiliation.

[¶ 14.] As a result of this experience, Froning claimed to have suffered depression and felt uncomfortable about going to Miller. She received counseling between October 1994 and March 1997, and claimed the incident with Engelmann caused memories of childhood sexual abuse to re-surface.

[¶ 15.] Engelmann explained he used the knee-chest position in order to get a better view of Froning's cervix and to palpate an ovary. He denied asking her to assume this position for any deviant sexual purpose. However, the two physicians called as expert witnesses refuted Engelmann's justification for using the position. One doctor who had performed over 30,000 pelvic exams in his 34 years of practice testified that he had never used such a position on a patient. He had seen it described in some texts, but understood that it was only sometimes used with pregnant women to facilitate labor, not to facilitate an exam or for any other diagnostic purpose. Another physician provided essentially the same opinion, additionally testifying that there would be no medical reason to use the knee-chest position on a non-pregnant woman, and that the use of such a position would be unusual and should have at least been documented in the patient's records.

[¶ 16.] At the close of Plaintiffs' case-in-chief and at the close of all the evidence, Engelmann moved the court for a directed verdict, based on his contention that evidence presented related to intentional torts rather than negligence. The court denied both motions. This argument was also the basis for Engelmann's motion for judgment n.o.v., which was likewise denied.

[¶ 17.] The jury returned a verdict in favor of Plaintiffs, and each was awarded $450,000. Additionally, Bertsch's and Froning's husbands were each awarded $50,000.

[¶ 8.] Engelmann now appeals the jury's verdict, raising the following issues:

1. Did the trial court abuse its discretion in denying Engelmann's motions for directed verdict and judgment n.o.v.?

2. Did the trial court abuse its discretion in consolidating Plaintiffs' cases for trial?

3. Was it prejudicial error to allow Plaintiffs to obtain and make use of the transcript from Engelmann's

medical license re-application hearing?

4. Was it prejudicial error to allow Plaintiffs to state that Engelmann was no longer a physician?

## DECISION

**[¶ 19.] 1. The trial court did not abuse its discretion in denying Engelmann's motions for directed verdict and judgment n.o.v.**

[¶ 20.] We review a trial court's consideration of a motion for directed verdict and judgment notwithstanding the verdict under the following standard:

A motion for a directed verdict under SDCL 15–6–50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

A motion for judgment n.o.v. is based on and relates back to a directed verdict motion made at the close of all the evidence. SDCL 15–6–50(b). Thus, the grounds asserted in support of the directed verdict motion are brought before the trial court for a second review. We review the testimony and evidence in a light most favorable to the verdict or the nonmoving party, "then without weighing the evidence [we] must decide if there is evidence which would have supported or did support a verdict[.]"

*Bland v. Davison County*, 1997 SD 92, ¶ 26, 566 N.W.2d 452, 460 (quoting *Sabag v. Continental South Dakota*, 374 N.W.2d 349, 355 (S.D.1985)). Thus, we apply the abuse of discretion standard when reviewing the trial court's ruling. *Id.* (citing *Treib v. Kern*, 513 N.W.2d 908, 914 (S.D. 1994)).

[¶ 21.] Engelmann contends that the Plaintiffs' evidence, even if believed, showed that he committed intentional acts, not negligence. He argues an act must be performed within the realm of patient care in order to constitute malpractice, and allegations of rape do not. Alternatively, he asserts that even if evidence was presented which tended to show negligence, there was no causal connection between it and a resulting injury; the injuries claimed by Plaintiffs resulted from intentional acts, not negligent ones, therefore no negligence cause of action was proven.

[¶ 22.] Plaintiffs generally agree that a physician's act must be performed under the pretext of treatment in order to constitute medical malpractice. They assert, however, that Engelmann's actions were indeed administered under the pretext of treatment. They claim South Dakota defines malpractice sufficiently broad to include both negligent and intentional acts.

[¶ 23.] In addition, Plaintiffs emphasize that they presented two separate bases of malpractice: utilization of improper positions, procedures and methods, and engaging in inappropriate and improper sexual contact. They contend that even if malpractice is not found on the latter claim, malpractice has still been shown on the former claim. They argue that regardless of whether Engelmann's acts stemmed from the use of his penis or a piece of gauze or merely an atypical position, they were nevertheless injured by his negligence.

[¶ 24.] How broadly do we define the tort of "malpractice?" Count One of each plaintiff's complaint was captioned, "Medical Malpractice." The complaints alleged that Engelmann was "negligent in failing to exercise a degree of reasonable skill and care with the degree of knowledge and expertise" ordinarily exercised by other

doctors. The complaints contained further allegations that as a result of Engelmann's "negligence and malpractice," Plaintiffs suffered damages.

[¶ 25.] The jury was instructed that Plaintiffs were seeking to recover damages "based upon their claims of professional negligence. Such negligence is commonly referred to as malpractice." The standard malpractice jury instruction was given:

> In performing professional services for a patient, a physician has the duty to possess that degree of knowledge and skill ordinarily possessed by physicians of good standing engaged in the same line of practice in the same or a similar locality.
>
> A physician also has the duty to use that care and skill ordinarily exercised under similar circumstances by physicians in good standing engaged in the same line of practice in the same or similar locality and to be diligent in an effort to accomplish the purpose for which the physician is employed.
>
> A failure to perform any such duty is negligence.

South Dakota Pattern Civil Jury Instruction 105–01 (1998). Apparently, under this definition, malpractice is synonymous with negligence. Any failure to use "that care and skill ordinarily exercised under similar circumstances" is considered negligence, and accordingly, malpractice.[3]

[¶ 26.] In *Rehm v. Lenz*, 1996 SD 51, 547 N.W.2d 560, a plurality decision, we held that a psychologist treating clinical depression was a "practitioner of healing arts,"

(per Justice Sabers), but that the medical malpractice statute of limitations, SDCL 15–2–14.1,[4] did not apply because doubt existed as to the characterization of the cause of action (per Chief Justice Miller). In that opinion Circuit Judge Dobberpuhl opined that, although "malpractice" claims against a psychologist should fall within the two-year malpractice statute of limitations, causes of action based on "intentional acts" should be outside the purview of the malpractice statute of limitations. *Id.* ¶ 52, 547 N.W.2d at 570–71. In response, Justice Sabers stated that "it does not make any difference [whether the act was negligent or intentional] because SDCL 15–2–14.1 provides a two-year statute of limitations for [actions] 'whether based upon contract or tort.' Even intentional acts *are torts* and are included." *Id.* ¶ 40, 547 N.W.2d at 569 (emphasis in original).

[¶ 27.] Later, in *Bruske v. Hille*, 1997 SD 108, 567 N.W.2d 872, we defined malpractice as "[a]ny professional misconduct or any unreasonable lack of skill or fidelity in the performance of professional or fiduciary duties. . . .". 1997 SD 108, ¶ 13, 567 N.W.2d at 876–77.[5] There we affirmed the grant of summary judgment in favor of an oral-maxillofacial surgeon who was sued by a former patient. The patient's cause of action claimed intentional torts of fraud and deceit, because the physician allegedly failed to timely inform the patient of the dangers of a defective implant in her jaw. We found that rather than constituting an intentional tort, the patient's actions sounded in negligence. As a result, the

---

3. Such an instruction was endorsed by this Court in *In re Yemmanur*, 447 N.W.2d 525 (S.D.1989) (regarding a physician's negligence standard); *In re Schramm*, 414 N.W.2d 31 (S.D.1987) (regarding a dentist's negligence standard); and *Lenius v. King*, 294 N.W.2d 912 (S.D.1980) (applying negligence standard to an attorney).

4. SDCL 15–2–14.1 provides:
   An action against a physician, surgeon, dentist, hospital, sanitarium, registered nurse, licensed practical nurse, chiropractor, or other practitioner of the healing arts for

malpractice, error, mistake or failure to cure, whether based upon contract or tort, can be commenced only within two years after the alleged malpractice, error, mistake or failure to cure shall have occurred[.]

5. The *Bruske* malpractice definition is nearly identical to Black's Law Dictionary 959 (6th Ed.1990), which defines the term as any "professional misconduct, unreasonable lack of skill or fidelity in professional or fiduciary duties, evil practice or illegal or immoral conduct."

action was governed by the medical malpractice statute of limitations, SDCL 15–2–14.1, and thereunder the patient's cause of action was not timely filed.

[¶ 28.] Further evidence that malpractice was intended to encompass more than negligence is found at SDCL 58–5B–1, where medical malpractice insurance is defined as "coverage against the legal liability of the insured ... arising out of the death or injury of any person as the result of *negligence or malpractice* in rendering professional service." (emphasis added). This statutory language seems to indicate that malpractice and negligence are two distinct legal concepts; not that malpractice is synonymous with negligence.

[¶ 29.] A review of the pertinent authority, while not directly on point, persuades us to conclude that for tort liability purposes, sexual misconduct falls within the definition of malpractice. Sexual misconduct is clearly encompassed in the concept of "professional misconduct" as malpractice is defined in *Bruske*. In turn, the jury instruction definition of malpractice could reasonably include professional misconduct, because such conduct would constitute a breach of "the duty to use that care and skill ordinarily exercised under similar circumstances by physicians in good standing."

[¶ 30.] "The negligence standard for doctors is no different than that for other professionals." *Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D.1986) (citing *Lenius*, 294 N.W.2d at 914; [Introduction] to Instruction 105.00 Malpractice, S.D. Pattern Civil Jury Instructions). With malpractice actions, "the issue on which the jury should be instructed ... is whether the doctor deviated from the required standard of care." *Id.* It is important to remember that deviation from the standard of care is not conditioned on bad faith or the physician's state of mind at the time of the alleged incident. *Id.* Thus, whether Engelmann's actions were intentional or negligent is irrelevant to the jury's finding of malpractice in this limited tort context.

[¶ 31.] The evidence showed that Engelmann breached his duty to "use that care and skill ordinarily exercised under similar circumstances by physicians in good standing" when he subjected Martinmaas and Bertsch to improper sexual contact. That deviation from the required standard of care, notwithstanding Engelmann's state of mind, constituted malpractice. Therefore, evidence of his sexual misconduct could have supported a jury determination of malpractice for tort liability purposes, and the trial court did not abuse its discretion in denying his motions for directed verdict and judgment n.o.v.[6]

[¶ 32.] We render this decision mindful of our well-established public policy disfavoring parties insuring against their own intentional acts. *See* SDCL 53–9–3 (providing that contracts which have the object of exempting anyone from responsibility for his own fraud, willful injury, or violation of law are against policy.); *State Farm Mut. Auto. Ins. Co. v. Wertz*, 540 N.W.2d 636 (S.D.1995) (holding that driver who intentionally drives car into truck with intention of injuring passenger is not allowed to inflict deliberate harm with financial impunity.); *Tri–State Ins. Co. of Minnesota v. Bollinger*, 476 N.W.2d 697 (S.D.1991) (stating that if insured, through intentional acts, consciously controls risks covered by the policy, the central concept of insurance is violated.); *City of Fort Pierre v. United Fire and Cas. Co.*, 463 N.W.2d 845 (S.D.1990) (reasoning that if a person is able to insure himself against economic consequences of his intentional

---

6. Froning does not claim that she was sexually assaulted by Engelmann. Notwithstanding, her claim of medical negligence is adequately supported by the record, especially the testimony of other physicians who stated Engelmann's examinations of her in the knee-chest position were improper and unnecessary and fell below the standard of care for a physician. The trial court did not abuse its discretion in denying Engelmann's motion for directed verdict and judgment n.o.v. with respect to Froning's claim.

acts, the deterrence attributable to financial responsibility is missing.).

[¶ 33.] Our decision today does not infringe upon that policy in any way. We emphasize that the fundamental issue here is not whether a particular insurance contract was intended to cover this conduct, but whether the conduct in question constitutes the tort of malpractice. *Cf. Snyder v. Major*, 789 F.Supp. 646, 650 (S.D.N.Y.1992) (stating that expansion of tort concept of malpractice more appealing than expansion of insurance concept of malpractice). Accordingly, we do not pass judgment on whether Engelmann's actions would be indemnified under a medical malpractice insurance policy. At this juncture, it is simply unnecessary and inappropriate for us to surmise what an insurer's or Engelmann's expectations as to coverage may or may not have been when entering into a malpractice insurance policy that is not even part of the record.

[¶ 34.] **2. The trial court did not abuse its discretion in consolidating Plaintiffs' cases for trial.**

■ [¶ 35.] The denial or grant of a motion to consolidate suits is reviewed under an abuse of discretion standard. *Case v. Murdock*, 488 N.W.2d 885, 892 (S.D. 1992); *Independent Sch. Dist. of City of Aberdeen v. First Nat'l Bank of Aberdeen*, 67 S.D. 100, 113, 289 N.W. 425, 431 (1939).

[¶ 36.] SDCL 15–6–42(a) provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

[¶ 37.] The trial court originally denied Plaintiffs' motion to consolidate. However, after determining that each plaintiff's testimony would be admissible in the others' cases, that the same experts would be testifying in each case, and that there were similar factual and legal issues which bound the cases and made them amenable to consolidation, the court reversed its previous ruling and granted the motion to consolidate.

[¶ 38.] Engelmann contends Plaintiffs' cases do not involve common questions of law and fact. He principally argues that the factual scenarios and damages sought differed significantly. In addition, he notes that there are witnesses who would not have testified in all three trials had the cases been separated. Finally, he argues that although the special damages incurred were different as to each plaintiff, the jury returned identical verdicts for each one, thereby proving that the jury prejudicially viewed the three cases identically.

[¶ 39.] In *Landstrom v. Shaver*, 1997 SD 25, 561 N.W.2d 1, we considered whether a trial court abused its discretion in consolidating claims for trial. There the defendants argued they were harmed when the trial court consolidated equitable and legal claims. *Id.* ¶ 25, 561 N.W.2d at 6. They argued that such consolidation prejudiced the jury by allowing in evidence related to the equity claim that would have otherwise been inadmissible for the legal claim. *Id.* Further, the defendants claimed there were no common issues of fact. *Id.* ¶ 27, 561 N.W.2d at 6.

[¶ 40.] While expressing concern about the inclusion of facts which were totally irrelevant to a given cause of action or a party, *id.* ¶ 34, 561 N.W.2d at 7, we stated that the " 'mere possibility of some prejudice does not justify separate trials where such prejudice is not substantial and there are strong countervailing considerations of economy.' " *Id.* ¶ 28, 561 N.W.2d at 6 (quoting *Tri–R Systems, Ltd. v. Friedman & Son, Inc.*, 94 F.R.D. 726, 728 (D.Colo. 1982)). We eventually concluded the judge did not abuse his discretion in consolidating the claims. *Id.* ¶ 34, 561 N.W.2d at 7. In reaching that decision we considered that the legal issues of breach of fiduciary duty and tortious interference overlapped

common facts with the equitable claim. *Id.* ¶ 27, 561 N.W.2d at 6. In addition, separate trials would have been non-conducive to expedition and economy. *Id.*

[¶ 41.] As in *Landstrom,* here we must weigh allegations of prejudice against judicial expedition and economy. Even after consolidation, this trial lasted eight days, involved over thirty witnesses, and produced over 1800 pages of records and exhibits. Considering the trial judge's decision that many of the witnesses would have given duplicate testimony had three separate trials been conducted, we understand how such an endeavor would have been anything but expeditious and economical. Despite Engelmann's claims to the contrary, there are common questions of law and fact among these cases. In each case, the plaintiff claims to have been subjected to an inappropriate, highly-traumatizing gynecological examination by Engelmann. These alleged incidents are relatively contemporaneous. Moreover, Engelmann mounts the same defense in each case: complete innocence from any wrongdoing. His claim that a handful of witnesses testified for only one plaintiff fails to show prejudice to the extent reversal is necessary. Similarly, his claim that the similar damage awards shows prejudice is unsupported.

[¶ 42.] In view of the law and circumstances in this case, the trial judge did not abuse his discretion in consolidating Plaintiffs' cases.

[¶ 43.] **3. It was not prejudicial error to allow Plaintiffs to obtain and make use of the transcript from Engelmann's medical license re-application hearing.**

[¶ 44.] A trial court's evidentiary rulings "are presumed correct and are reviewed under an abuse of discretion standard." *State v. Larson,* 1998 SD 80, ¶ 10, 582 N.W.2d 15, 17 (citing *State v. Goodroad,* 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129 (citation omitted)). "The test is not whether we would have made the same

ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id.* Further, the claimed error must have been more than harmless—it must have been prejudicial. SDCL 15-6-61.

[¶ 45.] Plaintiffs moved the trial court to allow discovery of a transcript of the hearing held by the State Board of Medical and Osteopathic Examiners regarding the denial of Engelmann's application for re-issuance of his medical license. After considering the parties' briefs, affidavits and arguments, the court granted Plaintiffs' motion. The discovery was limited by a protective order, however, which prohibited disclosure of the transcript, without order of the court, to anyone other than counsel representing the parties. Witnesses who testified at both the license hearing and the jury trial were allowed to review a transcript of their own hearing testimony during the trial.

[¶ 46.] Engelmann, citing SDCL 36-4-31.5, claims the disclosure of the hearing transcript was error. He argues that this Court must look to the overall framework of SDCL ch. 36-4 when interpreting this statute, asserting that such a review will reveal the legislature intended to protect the confidentiality of all proceedings pertaining to licensing, whether it involved revocation, suspension or re-issuance. According to Engelmann, to interpret SDCL 36-4-31.5 otherwise would make no sense.

[¶ 47.] In contrast, Plaintiffs argue the confidentiality statute extends the privilege only to proceedings involving cancellation, revocation, suspension or limitation of an existing license, and that had the legislature intended to include applications such as Engelmann's, it would have so stated in the statute. Plaintiffs assert that the testimony at such hearing was relevant to impeach the credibility of witnesses at the current trial, and both sides used the transcript in such a manner. Finally, it is argued Engelmann has not shown any

prejudice resulting from the use of the transcript at trial.

[¶ 48.] SDCL 36–4–31.5 provides:

Testimony of a witness or documentary evidence of any kind on cancellation, revocation, suspension or limitation proceedings are not subject to discovery or disclosure under chapter 15–6 or any other provision of law, and are not admissible as evidence in any action of any kind in any court or arbitration forum, except as hereinafter provided. No person in attendance at any hearing of the board of medical and osteopathic examiners considering cancellation, revocation, suspension or limitation of a license issued by it may be required to testify as to what transpired at such meeting. The prohibition relating to discovery of evidence does not apply to deny a physician access to or use of information upon which a decision regarding his staff privileges was based. The prohibition relating to discovery of evidence does not apply to any person or his counsel in the defense of an action against his access to the materials covered under this section.

[¶ 49.] Our rules of statutory construction are as follows:

Questions of law such as statutory interpretation are reviewed by the Court de novo.... The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be

given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed. Since statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject. But, in construing statutes together it is presumed that the legislature did not intend an absurd or unreasonable result. When the question is which of two enactments the legislature intended to apply to a particular situation, terms of a statute relating to a particular subject will prevail over the general terms of another statute.

*Moss v. Guttormson*, 1996 SD 76, ¶ 10, 551 N.W.2d 14, 17 (citing *U.S. West Communications, Inc. v. Public Util. Comm'n*, 505 N.W.2d 115, 122–23 (S.D.1993) (citations omitted)).

[¶ 50.] Applying these rules of statutory construction to this case, Engelmann's claim, that the introduction of the hearing transcript violated the confidentiality statutes, has merit. A review of SDCL 36–4–31.5 in the overall context of SDCL ch 36–4 reveals that the goal of the legislature was to protect all confidential information that surfaces during this type of proceeding—not only the physician's information, but patients' information as well. SDCL 36–4–26.1 is especially enlightening. It states in pertinent part:

The proceedings, records, reports, statements, minutes, or any other data whatsoever, of any committee described in § 36–4–42,[7] relating to the quality,

7.  SDCL 36–4–42 states:
    For the purposes of this section, a peer review committee is one or more persons acting as any committee of a state or local professional association or society, any committee of a licensed health care facility or the medical staff of a licensed health care facility, or any committee comprised of physicians within a medical care foundation, health maintenance organization, preferred provider

organization, independent practice association, group medical practice, provider sponsored organization, or any other organization of physicians formed pursuant to state or federal law, that engages in peer review activity. For the purposes of this section, a peer review committee is also one or more persons acting as an administrative or medical committee, department, section, board of directors, shareholder or corporate member, or audit

type, or necessity of care rendered by a member of a hospital medical staff or by hospital personnel, or acquired in the evaluation of the competency, character, experience or performance of a physician, dentist or allied health professional seeking admission or reappointment to the medical staff of a hospital, are not subject to discovery or disclosure under chapter 15–6 or any other provision of law, and are not admissible as evidence in any action of any kind in any court or arbitration forum, except as hereinafter provided.

[¶ 51.] This provision indicates that anything related to the "quality, type or necessity of care rendered" or to the "competency, character, experience or performance" of a physician is to remain confidential. When SDCL 36–4–31.5 is considered in pari materia to the rest of SDCL ch. 36–4, it becomes clear that the legislature intended for a re-application hearing to remain confidential. The confidential nature of the transcript was even acknowledged by the trial court in its decision to release the transcript.

[¶ 52.] Notwithstanding the mandate of the confidentiality statute, Engelmann fails to show how he was prejudiced by the inclusion of this evidence. In his reply brief, Engelmann only makes the general assertion that "[b]ecause the transcript was released and used during the course of the trial, Defendant was prejudiced." He does not specifically explain how he was prejudiced, or what portion of the transcript's disclosure caused him injury. Engelmann and many of the witnesses who testified at trial also testified at the license hearing, therefore there were no surprises contained in the transcript. Moreover, the court did limit use of the transcript for impeachment purposes only, and that is indeed how *both* sides utilized it. Although confidential information was released, its use was properly limited to only relevant and non-prejudicial information. Under our evidentiary standard of review, the trial court's decision must stand.

[¶ 53.] **4.  It was not error to allow Plaintiffs to state that Engelmann was no longer a physician.**

[¶ 54.] Prior to trial Engelmann sought to have any evidence relating to the status of his medical license excluded. The court ruled that Plaintiffs could establish that Engelmann no longer had a medical license; however, they were not allowed to present testimony regarding his attempt to re-acquire his license, the decision by the State Board of Examiners, or any other evidence concerning the reason he was no longer licensed to practice medicine. At trial Plaintiffs made numerous references to the fact that Engelmann no longer had a medical license. In addition, Plaintiffs' counsel inadvertently asked Martinmaas if she was aware Engelmann "had his medical license suspended in September of 1994?" This misstatement (Engelmann voluntarily surrendered his license; it was not suspended) prompted a motion for a mistrial, which was denied.

[¶ 55.] Engelmann claims this evidence is not only irrelevant, but also prejudicial. He argues that the repeated references to the fact that he no longer had a medical license, coupled with the misstatement by Plaintiffs' counsel, created a prejudicial impression in the minds of the jurors, i.e. it allowed the jury to infer that some authority had determined he should no longer be practicing medicine.

[¶ 56.] Plaintiffs, on the other hand, claim Engelmann's lack of a medical license is relevant to the case, because it was their allegations of assault that caused him to voluntarily surrender it. Further, they argue the lack of a license was relevant to impeach his credibility, and the information was used to undercut his opinions about the standard of care and proper pelvic examination procedure. According to Plaintiffs, if any other non-licensed doc-

group, including the medical audit commit-

tee, of a licensed health care facility.

tor had taken the stand and testified as an authority as Engelmann did, the lack of his or her license would have been properly elicited. Thus, they argue that Engelmann was rightfully impeached by evidence showing that he did not possess a medical license. We agree.

[¶ 57.] SDCL 19–12–1 (Rule 401) provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Relevant evidence is admissible; irrelevant evidence is inadmissible. SDCL 19–12–2 (Rule 402). Even if evidence is relevant, it may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion or needless presentation of cumulative evidence. SDCL 19–12–3 (Rule 403).

[¶ 58.] Here, it is clear the trial court weighed the probative-versus-prejudice factors as they related to Engelmann's license status. It found some probative value in the fact that he no longer had a license, but drew short of allowing in all related evidence, likely because of concerns about prejudice. A review of the record shows that Plaintiffs used this information to impeach the credibility of Engelmann, who was repeatedly referred to as "doctor" throughout the trial by his counsel. "The court performed the balance carefully as evidenced by the fact that it did reject some evidence sought to be introduced ..." *State v. McDonald,* 500 N.W.2d 243, 247 (S.D.1993). The evidence was properly limited to only probative information, accordingly the trial court did not abuse its discretion.

[¶ 59.] Affirmed.

[¶ 60.] SABERS and GILBERTSON, Justices, concur.

[¶ 61.] KONENKAMP, Justice, concurs in result.

[¶ 62.] AMUNDSON, Justice, dissents.

KONENKAMP, Justice (concurring in result).

[¶ 63.] The method by which we reach a decision is as important as the decision itself. *See* Karl N. Llewellyn, The Common Law Tradition, Deciding Appeals 274 (1960). For, whether it be true or false, our method may well shape the outcomes of cases to follow. To decide a question, we first categorize the problem. If a tort, we ask, what type of tort? Both the rules and the consequences applying to one tort may not apply to another. Here, we must distinguish a negligent act from an intentional one, a medical error from an act of barbarity. If we blur the differences, if we degrade the methods to distinguish those differences, the legitimate process of law degenerates.

### 1. Rape is Not an Act of Professional Negligence

[¶ 64.] Can rape and sexual misconduct constitute professional *negligence* if committed by a physician in the course of a gynecological exam? The answer is plainly no. No court has ever held otherwise under these circumstances. Although this Court ventures to answer it, the question before us today is not whether intentional acts constitute medical "malpractice." It is true that in *Bruske v. Hille,* 1997 SD 108, ¶ 13, 567 N.W.2d 872, 876–77, interpreting the medical malpractice statute of limitations, we wrote, "any professional misconduct" establishes malpractice. That statute covered "malpractice, error, mistake or failure to cure, whether based upon contract or tort...." SDCL 15–2–14.1. We held that acts alleged as intentional, but sounding in negligence, were covered by the limitations period. *Bruske* 1997 SD 108, ¶¶ 13–14, 567 N.W.2d at 877. There, the plaintiff sought to evade the medical malpractice statute of limitations by cloaking her suit as something other than a malpractice claim. We thought the statute broad enough to encompass the substance of plaintiff's complaint in spite of her attempts to artfully draft around it.

[¶ 65.] In this case, solely an action for negligence, the majority opinion groups negligence and intentional conduct into one category: malpractice. The plaintiffs themselves disclaimed any theory of intentional conduct. They dropped their intentional tort counts, and ostensibly for insurance coverage purposes, couched their claims as negligence. Accordingly, the trial court defined malpractice for the jury as negligence. Now, the Court's opinion redefines it. With the jury's decision rendered wholly on a theory of negligence, we are not, in retrospect, at liberty to change the definition in order to uphold the verdicts.

[¶ 66.] At trial, the jury was instructed that the plaintiffs seek to recover damages "based upon their claims of professional *negligence*. Such *negligence* is commonly referred to as malpractice." (Emphasis added.) Included in the court's instructions as an essential element of proof was the requirement that the plaintiffs show the "defendant was negligent." In defining professional negligence, the court instructed:

> In performing professional services for a patient, a physician has the duty to possess that degree of knowledge and skill ordinarily possessed by physicians of good standing engaged in the same line of practice in the same or similar locality.
>
> A physician also has the duty to use that care and skill ordinarily exercised under similar circumstance by physicians in good standing engaged in the same line of practice in the same or similar locality and to be as diligent in an effort to accomplish the purpose for which the physician is employed.
>
> A failure to perform any such duty is negligence.

In another instruction the court told the jury: "Plaintiffs allege that the defendant was negligent and deviated from the recognized standard of care by engaging in inappropriate and improper sexual contact with each plaintiff during her gynecological examination." Rape and sexual exploitation in the course of a pelvic exam are intentional acts utterly beyond the concept of failure to use due care and skill. Deborah S.S. v. Yogesh N.G., 175 Wis.2d 436, 499 N.W.2d 272 (Wis.Ct.App.1993).

## 2. Plaintiffs' Alternative Theory Will Sustain Verdicts

[¶ 67.] The court instructed the jury on the plaintiffs' alternative basis for their negligence action: "[P]laintiffs allege that the defendant was negligent and deviated from the recognized standard of care for gynecological examinations when he utilized improper positions, procedures and methods in conducting those examinations." The plaintiffs argue that it is not necessary to reach the question of whether sexual misconduct during a gynecological examination constitutes medical malpractice because their claims were not based solely on sexual misconduct but also on the improper procedures and methods Engelmann used in conducting his exams.

[¶ 68.] Engelmann was acquitted of the rape charges against him in his criminal case. In this civil action, he continued to deny any sexual misconduct. He claimed the procedures he used were medically necessary and the plaintiffs simply misperceived his actions. According to him, Bertsch and Martinmaas had a suspicious bodily discharge and during the course of his pelvic exam he used the "gauze procedure" to extract some of the discharge substance. He said the women mistook this procedure for rape. Nonetheless, the jury returned verdicts for the plaintiffs. These general verdicts did not specify whether the jury believed that Bertsch and Martinmaas were raped and that Froning was sexually exploited, or whether the jury only concluded that Engelmann's unorthodox "gauze procedure" and "uterine massage" employed in examining the women fell below the standard of care, as the plaintiffs' experts testified.

[¶ 69.] Engelmann conceded that he invented his "gauze procedure." He knew

no physician who used it, received no training for it, and cited no medical authority prescribing it. He admitted also that his procedure was a "mistake" and "wrong," but clung to his assertion that it did not violate the standard of care. The medically unnecessary and embarrassing "knee-chest" position Froning was required to assume on two occasions was also a deviation from the standard of care according to the expert witnesses. As for damages, the plaintiffs' experts acknowledged that although painful and humiliating, Engelmann's aberrant medical procedures would leave no permanent physical injuries, but nonetheless the emotional trauma could be significant and long lasting.

[¶ 70.] Is it possible that the jurors were unconvinced of the plaintiffs' allegations of sexual misconduct and simply rendered their verdicts based on expert testimony that Engelmann's examinations deviated from the standard of care? Perhaps the large verdicts suggest that the jury believed the worst allegations against Engelmann. But we cannot truly know which theory the jurors accepted. When it comes to reviewing general jury verdicts we have written numerously that if any reason exists to support them, they should be upheld. *See Builders Supply Co., Inc. v. Carr,* 276 N.W.2d 252, 257 (S.D.1979) (citation omitted).

[¶ 71.] Most federal courts adhere to the rule that a general verdict will be upheld only if there is substantial evidence to support each theory of liability submitted to the jury. These courts take the position that, as an appellate court cannot plumb the minds of jurors, a general verdict possibly based on an improper theory of liability must be reversed. Known as the "two-issue rule," it has been endorsed several times by the United States Supreme Court beginning in the Nineteenth Century: "[The verdict's] generality prevents us from perceiving upon which plea they found. If, therefore, upon any one issue error was committed, either in the admission of evidence, or in the charge of the court, the verdict cannot be upheld...." *Maryland v. Baldwin,* 112 U.S. 490, 493, 5 S.Ct. 278, 280, 28 L.Ed. 822, 823 (1884). *See also Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.,* 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305, 312 (1962); *United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki,* 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541, 545 (1959); *Wilmington Star Mining Co. v. Fulton,* 205 U.S. 60, 79, 27 S.Ct. 412, 419, 51 L.Ed. 708, 718 (1907). The Eighth Circuit recognizes a harmless error exception. *E.I. du Pont de Nemours & Co. v. Berkley & Co., Inc.,* 620 F.2d 1247, 1258 n. 8 (8th Cir.1980).

[¶ 72.] In contrast, South Dakota belongs to a minority of jurisdictions giving a converse meaning to the two-issue rule, calling it the general verdict rule: when a jury returns a general verdict encompassing two or more issues and the verdict is supported by at least one issue, the case will not be reversed.[8] In *Allen v. McLain,* 75 S.D. 520, 69 N.W.2d 390 (1955), this Court wrote:

> In determining whether error was probably harmless or probably prejudicial an appellate court is guided by all the factors in the case bearing on the likelihood of prejudice, the force of the evidence to sustain the verdict, the assumptions that the jury was intelligent, and where the verdict is sustainable on more than one

---

**8.** According to *Lahm v. Burlington Northern Railroad Co.,* 6 Neb.App. 182, 571 N.W.2d 126, 131 (1997), "[t]he general verdict rule has been adopted and applied in the states of Alabama, Arizona, California, Connecticut, Florida, Illinois, Ohio, South Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin to avoid reversing or remanding cases for a new trial where at least one determinative issue was properly submitted and could have supported the general verdict." *See, e.g. Larriva v. Widmer,* 101 Ariz. 1, 415 P.2d 424, 430 (1966); *Berger v. Southern Pac. Co.,* 144 Cal.App.2d 1, 300 P.2d 170, 172–73 (1956); *Harper v. Henry,* 110 Ohio App. 233, 169 N.E.2d 20, 26–28 (1959). *See also* 76 Am. Jur.2d Trials § 1149 at 120 (1975) (recognizing split of authority).

theory, that the verdict is based on the theory unaffected by error, where nothing in the case suggests the contrary. *Id.* at 394 (citing 5 C.J.S. Appeal and Error, § 1677). In *Allen*, the appellant argued that the trial court's instructions allowed the jury "to assume that mere negligence as distinguished from willful and wanton misconduct, would be sufficient ground for a recovery by the plaintiff . . . ." *Id.* at 392. The jury brought in a general "verdict of liability." The Court cited 5 C.J.S. Appeal and Error, § 1562(g), at 397: "As between proper and improper grounds or theories, a general verdict will often be presumed to be based on that ground or theory on which it can properly be sustained." *Allen,* 69 N.W.2d at 395.

[¶ 73.] Over the years, we have cited *Allen* several times in upholding the rule. In *Limmer v. Westegaard,* 251 N.W.2d 676, 679 (S.D.1977), the Court wrote that "[w]ithout an affirmative showing in the record to the contrary, we construe the jury verdict as rendered upon the properly submitted legal theory of negligence, rather than upon one improperly submitted." Likewise, in *Eberle v. Siouxland Packing Co., Inc.,* 266 N.W.2d 256, 258 (S.D.1978) the rule was reiterated: "This court has repeatedly stated that, in a civil case, if a general verdict is handed down and the jury could have decided the case on two theories, one proper and one improper, the reviewing court will assume that it was decided on the proper theory." As the trial court had instructed on both express and implied contract, the Court concluded that "even if the implied contract instructions were error, the giving of them was not reversible error ." *Id. See also Plucker v. Kappler,* 311 N.W.2d 924, 925 (S.D.1981) (verdict sustainable on theory other than the improper one); *Dwyer v. Christensen,* 77 S.D. 381, 92 N.W.2d 199, 202 (1958).

[¶ 74.] The general verdict rule controls in those actions brought on multiple theories of liability, where a single basis for damages applies. *See First Interstate*

*Dev. Corp. v. Ablanedo,* 511 So.2d 536, 538 (Fla.1987). The rationale for the rule was discussed in *Knisely v. Community Traction Co.,* 125 Ohio St. 131, 180 N.E. 654, 654 (1932):

> The soundness or unsoundness of the rule cannot be argued upon principle, because no principle is involved. It is purely and solely a question as to whether the trial court will be held to a strict accountability to submit each and every issue in a case free from error, or whether, on the other hand, if one issue complete in itself as a cause of action or defense is submitted free from error, and there is nothing to indicate upon which issue a general verdict is grounded, other issues may be disregarded. The rule was designed to simplify the work of trial courts and to limit the range of error [in] proceedings.

In *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593, 607 (1983), the court explained: "we fail to see the logic of a rule that requires a general verdict supported by one good theory of liability to be set aside. We are aware of no presumption that requires a court to assume that the jury has returned the verdict on the cause of action that was not supported by sufficient evidence. It must be remembered that in a civil case the burden of proof in order to prevail is only by a preponderance of the evidence." On the question of prejudice the court wrote:

> [A]ny supposed unfairness to the defendants arising from the adoption of the rule that permits the general verdict to be upheld if there is one valid cause of action to support it is cured by an additional corollary: that a defendant may submit a special interrogatory or verdict to require the jury to state its finding as to each theory. *E.g., Codekas v. Dyna–Lift Co.,* 48 Cal.App.3d 20, 121 Cal.Rptr. 121 (1975); *Colonial Stores, Inc. v. Scarbrough,* 355 So.2d 1181 (Fla.1978).

*Id.*

[¶ 75.] Acquiescence in a general verdict form can be fatal to claims of error by either plaintiffs or defendants. If a party

fails to request the separate submission of multiple theories, a new trial will not be granted where the jury has rendered a general verdict and the appellate court finds no error in one of the theories on which the jury was instructed. *See Colonial Stores*, 355 So.2d at 1185–86 (explaining that the "two-issue" rule is a "rule of policy, designed to limit the scope of proceedings on review.").

[¶ 76.] As the Florida Supreme Court explained, "the remedy is always in the hands of counsel." Counsel can request a special verdict on each theory in the case and object to a general verdict. *Id.* at 1186. If, however, counsel has neither requested a special verdict nor objected to submitting a general verdict form to the jury, then under the rule, a general verdict cannot be reversible error. *Id. See also Whitman v. Castlewood Int'l Corp.*, 383 So.2d 618 (Fla.1980). The objection and the request will avoid the rule, even when the trial court declines the request.

[¶ 77.] Here, Engelmann did not seek a special interrogatory or object to a general verdict. As the verdict encompasses two liability issues, one of which the evidence supports, it should not be reversed. Perhaps this carries the general verdict rule to its logical extreme, but there is no claim here that the verdict amounts were excessive, the question instead being the propriety of averring as negligence rape and sexual misconduct.

[¶ 78.] Accordingly, I concur in result on Issue 1, and concur in full on the remaining questions.

AMUNDSON, Justice (dissenting).

[¶ 79.] I regretfully dissent in the cases involving Bertsch and Martinmaas because in my opinion, the law dictates that I must.

[¶ 80.] In both of the above cases, the patients testified that Dr. Engelmann sexually violated them. Further, the plaintiffs put on other bad acts evidence from another patient who testified that during a gynecological exam she had observed Dr. Engelmann in the room with his penis hanging out of his unzipped pants. This was the incident which provided the impetus of the criminal and civil cases filed against Dr. Engelmann.

[¶ 81.] Does sexual misconduct by a predator physician constitute medical malpractice? To establish a medical malpractice action, one must establish that the medical professional "breached a recognized standard of care and was thereby negligent." *See Schrader v. Tjarks*, 522 N.W.2d 205, 214 (S.D.1994) (Amundson, J., concurring in part and dissenting in part). The gist of the medical malpractice action is the *"negligence"* of the doctor in rendering services to the patient.[9] A majority of jurisdictions have determined that "sexual assault by a physician on a patient is generally not covered by malpractice insurance." *See Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 698 A.2d 9, 12–14 (1997). Further, the scope of medical malpractice coverage has been defined as "limited to the performing or rendering of 'professional' acts or services." *See id.* at 13 (quoting *Marx v. Hartford Accident & Indemn. Co.*, 183 Neb. 12, 157 N.W.2d 870, 871–72 (1968)). Clearly, the intentional act of sexually assaulting a patient is devoid of any "performance of professional acts or services."

[¶ 82.] In American jurisprudence, there exists an abiding principle " 'that common

---

9. Jury Instruction 3 states that professional negligence (malpractice) could result from the defendant being "negligent and deviat[ing] from the recognized standard of care by engaging in inappropriate and improper sexual contact with each plaintiff during her gynecological examination." Nowhere in the remainder of the court's instructions is there any definition or statement as to what ele-ments have to be proven by a preponderance of the evidence to establish malpractice by inappropriate and improper sexual contact. By inserting this statement of the law of this case, it tells the jury that there is a claim for negligent sexual malpractice, but how is the jury to know when it is negligence or intentional when the bulk of the evidence is inappropriate, intentional sexual contact.

sense does not take flight when one enters a courtroom.'" *See St. Paul Fire & Marine Ins. Co. v. Shernow*, 222 Conn. 823, 610 A.2d 1281, 1286 (1992) (Borden, J., dissenting) (quoting *American Nat'l Fire Ins. Co. v. Schuss*, 221 Conn. 768, 607 A.2d 418 (1992)). This common sense should not be left at the door, even at this appellate level. Common sense tells me that sexual assault is an *"intentional"* tort. *See., e.g., Paneson v. Zubillaga*, 753 So.2d 127, 129 (Fla.Dist.Ct.App.2000) (addressing doctor's unlawful and unpermitted sexual touching of patient as an intentional tort); *Primeaux v. United States*, 149 F.3d 897, 903 (8th Cir.1998) (Loken, J., dissenting) (noting that under the Federal Tort Claims Act § 2680(h), "[r]ape and other sexual assaults are within the classes of intentional torts"); *Fearing v. Bucher*, 328 Or. 367, 977 P.2d 1163, 1166 (1999) (discussing employer's vicarious liability for an employee's intentional tort of sexual assault); *Howcroft v. Howcroft*, 223 B.R. 845, 849 (N.H.Bank.1998) (noting that sexual assault falls within traditional category of intentional tort); *Moen v. Baransky*, 1997 WL 666763, *1 (Conn.Super.Ct.1997) (addressing the elements of the "intentional tort of sexual assault"). Both these patients had pled an intentional tort claim, but dismissed those claims prior to trial.

[¶ 83.] In the case of *St. Paul Insurance Co. of Illinois v. Cromeans*, 771 F.Supp. 349 (N.D.Ala.1991), the court was dealing again with a coverage issue involving sexual mistreatment of patients and held as follows:

> ST. PAUL's professional liability policy issued to [Dr.] Joe G. Cromeans was intended by the insurer and the insured to cover the insured doctor for injuries he negligently or wantonly caused while medically treating or attempting to medically treat a patient for a medical ill *but not for intentional actions taken by the insured doctor directed to or towards the patient to satisfy the doctor's sexual lust or to otherwise further his own prurient interests.*

> . . . .

The *Hirst* court quoted an oft-used definition of "professional services" from *Marx v. Hartford Accident and Indemnity Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968).

> The scope of "professional services" does not include all forms of a doctor's conduct simply because he is a doctor ... Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind ... *In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.*

*Id.* at 353 (citing *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 683 P.2d 440 (Idaho Ct.App.1984)) (emphasis added).

[¶ 84.] To consider Dr. Engelmann's sexual misconduct malpractice under the guise of negligence would amount to covering an intentional act in a lamb's coat so that the wolf has coverage. I submit that since the intentional tort theory against Dr. Engelmann was dismissed prior to trial, the jury should not have been considering his intentional misconduct. While I find it highly deplorable that a professional would deliberately and intentionally engage in such a flagrant violation of the law and professional ethics solely to satisfy his prurient interests, neither the loathsomeness of the tortfeasor's conduct nor the sympathy towards the victims should control our decision in this case.

[¶ 85.] We have often stated that although a party is not entitled to a perfect trial, they are entitled to a "fair trial." *Atkins v. Stratmeyer*, 1999 SD 131, ¶ 57, 600 N.W.2d 891, 904 (Amundson, J., dissenting) (quoting *McDonough Power*

*Equipment, Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663, 669 (1984)). A fair trial did not occur in the present case due to the injection of the alleged sexual assault, an intentional act, into the malpractice action. It is especially unfair considering the fact that the parties voluntarily dismissed the intentional tort claims prior to trial. The trial court should guard against allowing inflammatory evidence to be presented at trial which has no beneficial value other than escalating the damages award. *See, e.g., Gilkyson v. Wheelchair Express, Inc.,* 1998 SD 45, ¶ 14 n. 3, 579 N.W.2d 1, 5 (stating that "[t]he ideal in any trial is to keep improper and inflammatory questions or evidence from the jury"). The majority's decision attempts to support its conclusion that malpractice encompasses more than negligence by citing SDCL 58–5B–1, which defines medical malpractice as "coverage against the legal liability of the insured ... arising out of the death or injury of any person as a result of *negligence or malpractice* in rendering professional services." (emphasis added by majority opinion). As Justice Border stated in his dissent in *Shernow,* the intentional sexual assault by Dr. Engelmann "no more constituted the rendering of professional services than if a lawyer, angry at his client, hit her over the head with volume 24 of Corpus Juris Secondum." 610 A.2d at 1286 (Borden, J., dissenting). I submit that Dr. Engelmann was denied a fair trial where the trial of an intentional act transpired under the guise of it being a negligence/malpractice case.[10]

[¶ 86.] I would reverse and remand this case for a retrial solely on the medical malpractice claim relating to the alleged use of the "uterine massage and gauze procedure" since it certainly appears that

these plaintiffs are entitled to recover under a real malpractice theory rather than the intentional tort.

---

**10.** In Oxford Dictionary of American Legal Quotations 229 (1993) (quoting William Penn, *Fruits of Solitude* 71 (11thed 1906)), it provides that "[j]ustice is justly represented blind, because she sees no difference in the parties concerned.... She has but one scale and weight, for rich and poor, great and small.... Her sentence is not guided by the person, but the cause .... Impartiality is the life of justice, as that is of government." No matter whether a person is rich or poor, black or white, good or bad, a doctor or street person, they come into a courtroom on the same footing. Everyone comes into court on the same level and that does not appear to be the case here.