#24857-r-SLZ

**2009 SD 97**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

GERALD R. NEVE and NANCY K.
NEVE, husband and wife,                         Plaintiffs and Appellants,

        v.

DONALD L. DAVIS, an individual
and THE DONALD L. DAVIS LIVING TRUST,        Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE KATHLEEN K. CALDWELL
Judge

\* \* \* \*

ROLLYN H. SAMP
Samp Law Offices                        Attorneys for plaintiffs
Sioux Falls, South Dakota               and appellants.

MICHAEL A. HENDERSON of
Cadwell, Sanford, Deibert & Garry, LLP  Attorneys for defendants
Sioux Falls, South Dakota               and appellees.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 23, 2009
REASSIGNED JUNE 30, 2009

OPINION FILED **11/04/09**

#24857

ZINTER, Justice (on reassignment).

[¶1.]        A jury found that repayment of a gambling debt was a part of the consideration for a promissory note executed by Gerald Neve in favor of the Donald L. Davis Living Trust.  In accordance with the jury verdict, the circuit court voided the note pursuant to a statute that prohibits enforcement of notes given in full or partial consideration of gambling debts.  Neve appeals the circuit court's subsequent entry of a judgment notwithstanding the verdict (j.n.o.v.) in favor of the Davis Trust.  We reverse and remand for reinstatement of the judgment entered on the jury verdict.

*Facts and Procedural History*

[¶2.]        Neve and Donald Davis met in the early 1990s through their membership in the Elks Club in Sioux Falls.  Neve and Davis frequently gambled against each other and with other members at the club.  According to Neve, one evening in 1992, he lost $1,500 to Davis and did not have the money to pay the debt.  Neve testified that Davis told him not to worry about it and that they would work something out.  Davis, however, denied that there ever was a $1,500 gambling debt.  He testified that "there was never any gambling debt between – that [Gerald] Neve owed me nor was there ever any payment made by the gambling debt."

[¶3.]        During this same period of time, Neve was experiencing financial difficulties.  He was significantly indebted for business expenses, medical expenses, and taxes due the Internal Revenue Service.  In an effort to assist Neve, Davis loaned him $2,500 in December 1992.  A promissory note for that amount was

executed on December 10, 1992. Because Neve continued to experience financial difficulties, Davis subsequently referred Neve to bankruptcy attorney Claire Gerry.

[¶4.] After Gerry had reviewed Neve's financial affairs, Davis agreed to loan Neve an additional $30,000. Neve specifically testified that this amount *included* repayment of the $1,500 gambling debt. *See infra* ¶ 15 (citing Neve's testimony that the $30,000 loan was calculated as the amount necessary to satisfy his other financial obligations "*plus* the 1500"). On September 22, 1993, Davis placed the $30,000 in a trust account at Gerry's law firm. Neve testified that Davis called him when the note was ready to be signed and specifically cautioned Neve to not mention to Gerry that the proceeds of the note "were going to be used to pay off" the gambling debt to Davis. *Infra* ¶ 15. Neve and his wife subsequently executed a note for $33,000 in favor of the Donald L. Davis Living Trust. The note was for the $30,000 second loan, plus $3,000 representing a renewal of the $2,500 note from December 1992 and $500 in interest.

[¶5.] Gerry handled disposition of the proceeds. There is no dispute that all of the proceeds of the $30,000 loan, less the $500 in interest, were either paid directly to Neve or his creditors. Gerry provided an accounting to Davis, which was admitted into evidence at trial. The accounting reflected the following disbursements:

- September 1993: $9,005.63, Dakota State Bank
- January 1994: $4,000.00, Check to Neve
- May 1994: $7,500.00, Accounts Management
- July 1994: $1,700.00, Payment to Neve

- August 1994:     $2,074.50, Attorney Fees

- August 1994:     $5,719.87, Check to Neve

Neve testified that pursuant to his agreement with Davis, he used $1,500 of the January 1994 $4,000 check to pay his gambling debt to Davis.

[¶6.]       On June 2, 2005, Neve commenced an action for a declaratory judgment to have the promissory note declared void under SDCL 53-9-2 (providing that notes given in full or partial consideration of gambling debts are absolutely void). Davis counterclaimed for $83,155.59 (representing principal and interest, less payments made on the $33,000 note).

[¶7.]       Neve moved for summary judgment. The court denied the motion, indicating that neither party was entitled to summary judgment. The court reasoned that a genuine issue of material fact existed for trial on the question whether a gambling debt was part of the consideration for the note.

[¶8.]       The trial involved this limited factual question. The competing theories were straightforward. Neve contended that repayment of the gambling debt was part of the consideration for the loan. On the other hand, Davis contended that there never was any gambling debt, and therefore, part of the consideration for the loan could not have been to repay a gambling debt. Counsel for both sides agreed that the question of consideration was dependent upon which of the two witnesses the jury chose to believe. During opening statement, Neve's counsel explained that the jury would hear conflicting evidence on "how this debt [was] incurred and how it was paid":

> [Y]ou are going to hear lots of testimony back and forth as to
> how this debt incurred and how it was paid and I think you can

expect Mr. Davis to deny that any part of it was a gambling debt and you are going to have to separate out the integrity of the two people, my client and Mr. Davis. They both can't be telling the truth. And it's you, as jurors, that are going to have to decide really who is telling the truth in this case.

Davis's counsel agreed that the "only issue" was to determine who was telling the truth, and Davis's position was that the transaction "was nothing more than a loan." His counsel argued:

The evidence . . . will not show there is any gambling debt. . . .

[T]his is not about a promissory note that was made to secure or to repay a gambling debt. . . . This is, however, a very unusual trial because it boils down to who you believe. . . . What the jury is going to have to do is to look into all the details of what each witness is saying to determine who is telling the truth and that is the only issue the jury will have to deal with today[.] . . . It was nothing more than a loan and there is nothing about a gambling debt in this transaction[.]

Thus, the only issue at trial was whether the transaction "was nothing more than a loan," or whether part of the consideration included a gambling debt.

[¶9.] At the close of Neve's case-in-chief, Davis moved for a directed verdict. The circuit court denied the motion, acknowledging that Neve's evidence was sufficient for a jury to have concluded that the loan was made in partial consideration of a gambling debt. The jury ultimately returned a verdict in favor of Neve. Pursuant to the verdict, the circuit court entered a judgment declaring the note void.

[¶10.] Davis subsequently moved for a j.n.o.v. The circuit court granted the motion. Notably, the court did not find that the gambling debt was not part of the consideration for the note. Rather, the court concluded that even if the loan was motivated by the gambling debt, the consideration was for "money loaned."

Therefore, the court found the evidence insufficient to support the jury verdict. Neve appeals arguing that the evidence was both factually and legally sufficient to support the verdict.

*Decision*

[¶11.] We generally review the circuit court's j.n.o.v. under the abuse of discretion standard. Welch v. Haase, 2003 SD 141, ¶ 19, 672 NW2d 689, 696. However, the decisive question in this type of case is a factual issue: whether the note involves gambling. 7 Richard A. Lord, Williston on Contracts § 17:16 (4th ed 2009). Therefore, we must examine the facts supporting the jury verdict. "We review the testimony and evidence in a light most favorable to the verdict of the nonmoving party, 'then without weighing the evidence [we] must decide if there is evidence which would have supported or did support a verdict.'" Martinmaas v. Englemann, 2000 SD 85, ¶ 20, 612 NW2d 600, 606 (citation omitted). "Conflicting evidence is not reweighed; witness credibility is not reassessed. The moving party's evidence is only given consideration if it is uncontradicted or tends to amplify, clarify or explain evidence which supports the verdict." *Welch*, 2003 SD 141, ¶ 19, 672 NW2d at 696 (citation omitted).

[¶12.] Neve argues that factually, the circuit court's j.n.o.v. nullified a jury decision on a disputed issue of fact and failed to consider Neve's testimony in a light most favorable to the verdict. Neve contends that the court failed to consider his testimony that he owed Davis $1,500 for the gambling debt; that the amount of the note was determined by including the gambling debt; that Davis specifically told Neve not to mention to Gerry at the time of signing the note that some of the funds

were going to be used to pay off the gambling debt; and that the note proceeds were used to repay the gambling debt. Neve also argues that in light of these facts, the circuit court erred as a matter of law in concluding that the note was made for "money loaned" rather than in partial consideration of a gambling debt.

[¶13.] For more than 100 years, the Legislature has provided that if *any part of the consideration* for a note is for the repayment of money lost in gambling, the entire note is absolutely void.

> Any note, bond, or other contract made and entered into, *where the whole or any part of the consideration* thereof shall be for money or other valuable thing, won or lost, laid, staked, or betted at or upon any game of any kind, under any name or by any means; *or for the repayment of money* or other thing of value, lent or advanced, at the time and for the purpose of any game, play, bet, or wager, or being laid, staked, betted, or wagered thereon shall be absolutely void.

SDCL 53-9-2 (emphasis added). Following this statute, this Court has consistently voided such agreements. *See* Bayer v. Burke, 338 NW2d 293, 294 (SD 1983); McCardell v. Davis, 49 SD 554, 554, 207 NW 662, 662 (1926); Waite v. Frank, 14 SD 626, 635, 86 NW 645, 648 (1901); *see also* Union Collection Co. v. Buckman, 150 Cal 159, 164, 88 P 708, 711 (1907); *see generally* Jones v. Yokum, 24 SD 176, 123 NW 272 (1909) (involving illegal notes given as consideration for the sale of liquor). The statutory prohibition is viewed as an affirmative defense. It imposes on the party asserting the failure of consideration due to gambling the burden of proving that the note was made in partial consideration of the gambling debt. *See* Scolaro v. Bellitto, 184 NE2d 604, 607 (OhioCtApp 1962). However, "[i]t makes no difference whether the real intention is formally expressed in words or not, if the facts and

circumstances in proof show that it was the real understanding that [the matter involved a gambling transaction]." *Waite*, 14 SD at 626, 86 NW at 647.

*Factual Sufficiency*

[¶14.]     Reviewing Neve's testimony in a light most favorable to the jury verdict, there are facts and circumstances indicating that it was the understanding of the parties that part of the consideration for the loan was the repayment of the gambling debt. Notwithstanding Davis's denials, Neve testified to the following material facts:

- He and Davis played cards against each other at the Elks Club;

- On occasion, Neve became indebted to Davis for gambling and that if he could not pay the debt, he and Davis would work out an arrangement where Neve would repay Davis at a later time;

- On an evening in 1992, he lost $1,500 to Davis gambling;

- Neve did not have the money to pay the gambling loss, and Davis told Neve to not worry about it as they would work something out;

- In September 1993, Davis loaned Neve the $30,000 because Neve was having financial difficulties, but the loan also included repayment of the $1,500 Neve owed Davis for gambling;

- When the loan documents were ready to be signed, Davis warned Neve to not mention the gambling to Gerry;

- In January 1994, Neve met Davis at the YMCA to pay him the $1,500 in cash because Davis wanted to be paid in cash; and,

- The $1,500 came from the $30,000 loan, specifically, the January 1994 $4,000 check to Neve.

[¶15.]     Notwithstanding our standard of review, the dissent views this evidence in a light favorable to Davis's assertion that the evidence cannot establish the inference that the gambling debt was part of the consideration for the loan. However, Neve's *specific testimony*, which the dissent does not even acknowledge, unequivocally reflects that the gambling debt was part of the consideration for the loan. Neve specifically testified as follows:

> Q     Did you ever become indebted to Mr. Davis from gambling?
>
> A     Yes.
>
> Q     And when did that occur?
>
> A     I can't give you an exact date. But, I mean, like on Thursday nights. Thursday nights, you mean? I can't give you an exact date when I lost money. There was [sic] several times that he backed me.
>
> Q     If you lost money, if you didn't have money to pay, then did I understand you to say Mr. Davis backed you?
>
> A     He would carry me. We would make some kind of arrangement and I would pay him next week or he would hold a check for me at times. It was something like that most of the time.
>
> Q     Was there any time that you recall that you didn't square up a gambling debt to him?
>
> A     Yes. I lost about [$]1,500 one night and I just didn't have it and he says don't worry about it, we will work something out.
> . . . .
>
> Q     And do you recall the year that this $1,500 debt occurred?
>
> A     I'm thinking it was about back in 1992, in that area.
>
> Q     Okay.

A   It's hard to remember the exact date. It's been quite a few years.

Q   *Did you eventually pay that gambling debt to Mr. Davis?*

A   *Yes, I did.*

Q   **How did you pay the debt***?*

A   **When I finally made a loan** *from, total loan of [$]30,000 from Don* and I got a check from his attorney for $4,000, I put it in Jerry's Repair and I took out the [$]1,500 and I called Don and he was out of town. So I had to wait until he come [sic] back -- I think it was Germany -- and I met him at the YMCA and paid him.

Q   How did you pay him?

A   **Cash. He wanted cash**.

Q   **Where did that money come from?**

A   **Out of the money that he loaned me**.

. . . .

Q   *Well, okay.* **How did the $30,000 loan, how did that take place?**

A   Well, I was in trouble with the IRS and stuff. *Don told me he would help me and take care of this note at the same time that I owed him* **plus the [$]1,500. So this is where we got up to [$]30,000** [1] and he paid my truck off

---

1.  Davis's own evidence confirms the jury's finding that the loan was part of a scheme to securitize and facilitate payment of the antecedent gambling debt. Davis counterclaimed for recovery on the note, claiming that at the time of the suit, $85,155.59 remained owing. In supporting this claim, Davis filed an affidavit itemizing the only payments for which Davis gave Neve credit on the note. Davis's affidavit reflects that he failed to give Neve credit for the $1,500 gambling payment Neve had made from the loan proceeds. Thus, if Davis had been permitted to enforce repayment of the face amount of the note without credit for Neve's $1,500 payment, Davis's scheme would have enabled him to obtain repayment of the gambling debt with the proceeds of the note and still obligate Neve to repay the face amount of the note.

(continued . . .)

so I wouldn't have no payment there and then Clair Gerry and him worked out a settlement with the bill for the hospital and they paid that. I think it was around [$]9,000.

. . . .

Q    Did either you or Mr. Davis tell Attorney Gerry that *some of the funds **were going to be used** to pay off a gambling debt?*

A    No. *When Don called me the morning that we were supposed to meet down there, he called me at my house and he said the attorney has got all the papers set up. You and your wife go down there and sign and **do not mention the gambling.*** That was his exact words and I didn't.

Q    Did you ask him why you weren't supposed to mention gambling?

A    No. Didn't know why.[2]

(Emphasis added.)

[¶16.]    We acknowledge Davis disputed these material facts, testifying only that: he played cards against Neve at the Sioux Falls Elks Club; Neve never owed or paid Davis a $1,500 gambling debt; and, he loaned Neve a total of $32,500 (plus $500 interest) only because he was sympathetic to Neve's financial difficulties and

_____

(. . . continued)
Through this scheme, Davis would have recovered a $1,500 gambling debt from the loan proceeds and an additional $30,000 from Neve's personal funds.

2.    Considering all of this testimony under our deferential standard of review, it is difficult to understand how the dissent can state: "Neve does not testify that Davis loaned him $30,000 in exchange for repayment of the $1,500 gambling debt," *see infra* ¶ 33; and, that "Neve's only evidence to support his claim it was part of the consideration was that he repaid the prior $1,500 gambling debt from the proceeds of the $30,000 and that Davis told him not to mention the gambling debt to the lawyer," *see infra* ¶ 35. Neve specifically testified that the loan was calculated by determining the sum of Neve's other financial obligations "plus the [$]1,500."

without respect to gambling. As the moving party, however, we must disregard Davis's testimony because it was contradicted and did not tend to merely amplify, clarify or explain evidence that supported the verdict. *See Welch*, 2003 SD 141, ¶ 19, 672 NW2d at 696. Considering Neve's testimony, there was sufficient evidence to support the jury's finding that a gambling transaction was part of the consideration for the note.

*Legal Sufficiency*

[¶17.] There is no dispute that Neve, either directly or indirectly, received the proceeds of the $30,000 loan before he used part of the proceeds to repay the gambling debt. Seizing on this fact, the circuit court granted the j.n.o.v., concluding that the statute did not apply. The court did not indicate that it was overturning the jury's finding that the gambling debt was part of the consideration for the note. The circuit court acknowledged that the gambling debt was part of the motivation for the loan and the gambling debt was satisfied from the proceeds of the note. However, the circuit court found these facts "irrelevant." The court reasoned that the note did not specifically obligate repayment of the gambling debt and the statute was not intended to apply where a note evidences "new money that was actually loaned." The court ultimately concluded that because Neve actually received money loaned before he used part of the proceeds to repay the gambling debt, the connection between the gambling debt and the loan was too "attenuated" to make it "fair" for the statute to apply. Although we concede that this legislative enactment leads to harsh results in cases where only part of the consideration was for gambling, well established law does not support the circuit court's semantical

#24857

distinction permitting parties to do indirectly what the Legislature has expressly prohibited.

[¶18.] The circuit court's reasoning is premised on the theory that even though it is unlawful to enter into a contract to repay a gambling debt, it is lawful to do so indirectly by entering into a second agreement that secures and pays but does not mention the antecedent gambling debt. We explained the reason for rejecting such theories in an analogous case involving an indirect attempt to avoid an illegal loan involving an alcohol transaction. In refusing to enforce a loan that, although based on new consideration, was also part of an original illegal obligation, we explained:

> [N]o action of the parties or their assignees can so validate an illegal contract, as to justify a court in enforcing it, where its illegality appears. . . . It would furnish an easy method by which the parties to an illegal contract might, by their mere stipulation, validate the same, and make it compulsory upon the courts to thereafter enforce it, although its illegality was clearly made to appear.

Beverage Co. v. Villa Marie Co., 69 SD 627, 631, 13 NW2d 670, 671 (1944) (citing *Buckman*, 150 Cal 159, 88 P at 711). *See also* First State Bank, Thayer v. Spencer, 7 KanApp2d 147, 152, 638 P2d 379, 383 (1981) (concluding that: where chairman of board of plaintiff bank and several bank officers went on fishing trip where gambling occurred, and defendant lost several thousand dollars to chairman, and thereafter defendant borrowed money from plaintiff bank to pay the gambling debt, signing a note for the debt, note would not be enforced. To enforce note would permit chairman to "accomplish indirectly what could not be done directly. . . .").

[¶19.] Similarly, in a case considering a then-illegal form of gambling involving commodity trading, we held that the parties could not formally contract

-12-

for the sale of commodities but informally agree that no delivery would take place in
an attempt to create a valid contract for the purpose of avoiding gambling
prohibitions. *Waite*, 14 SD at 636, 86 NW at 646. We observed "courts attach but
little importance to the formalities observed in executing an apparent contract, and
look to the real intention of the parties." *Id*. at 634, 86 NW at 647. We explained:

> [H]owever perfect the likeness of a gambling transaction to the
> form and features of a legitimate [transaction], the legality of
> the dealings between the parties must rest ultimately upon their
> honest intention. Illegality is seldom guilty of the consummate
> folly of flaunting its defiance of law in the face of public
> sentiment, -of furnishing itself the evidence of its violation of
> law. To escape the penalties of breaking the law, it will always
> put on the 'suits and trappings' of honest transactions. Mere
> wagering contracts invariably wear the garb of bona fide
> [transactions]. . . . The courts have always sought to pierce the
> disguise and ascertain the real intention of the parties.

*Id*. at 634, 86 NW at 647-48 (citation omitted).

[¶20.]    For this reason, the dissent is simply wrong in "agree[ing] with the
circuit court's analysis" that attaches legal significance to the fact that "[t]he
promissory note *does not [expressly] obligate* Neve to repay any money owed for a
gambling debt." *Infra* ¶ 29 (emphasis added). The cases are clear that Davis may
not accomplish informally what he could not have done formally; i.e., secure and
facilitate repayment of the antecedent gambling debt by enforcing a note made
partially for other purposes, but also for the purpose of repaying the gambling debt.
As this Court has previously stated:

> No matter what the form of the contract, no matter how many
> colorings of reality and genuine dealings are thrown about the
> transaction, if, piercing all these disguises, the court or jury see
> that all these forms are mere shams, and that there was in fact
> [an underlying gambling transaction], but that forms were
> adopted as a mere semblance to deceive and evade the law, it is

> the duty of the court and jury to tear away the disguise, and treat the transaction as it is.

*Waite*, 14 SD at 626, 86 NW at 648 (citation omitted).

[¶21.] The dissent is also misguided in adopting the circuit court's second premise that: "The fact that Neve used a portion of the money received to repay that debt is irrelevant." *Infra* ¶ 29. Neve's use of the loan proceeds to repay the gambling debt was an essential element of Neve's gambling/loan claim under SDCL 53-9-2: a factual dispute that the jury resolved in favor of Neve.

[¶22.] The dissent also adopts the circuit court's third premise that: "It would be unfair and contrary to the law to allow Neve to void his debt by making an attenuated connection to a gambling debt." *Infra* ¶ 29. This reasoning is misplaced for two reasons. First, with respect to "attenuated connections," it was the jury's exclusive province to determine whether the gambling debt was sufficiently connected to the loan. The jury was instructed (without objection) that if it found "that any part of the loan was for the purpose of paying gambling debts," they were to find for Neve, and if they found that "no part of the loan was for the purpose of paying gambling debts" they were to find for Davis. The jury decided this question in favor of Neve, and therefore, under our standard of review, we are not permitted to draw the adverse inference that the loan was not at least partially connected to the gambling debt. Second, with respect to the circuit court's concern for "fairness" in applying the statute in partial consideration cases, the legislature has resolved the matter. We have specifically held that "[t]he language of SDCL 53-9-2 is clear: any note or contract with *any part of the consideration thereof* involving money won or lost at gambling is absolutely void." *Bayer*, 338 NW2d at 294 (emphasis added).

[¶23.] The dissent finally errs in disregarding material evidence, preferring instead to spend three paragraphs reweighing Neve's testimony to draw inferences contrary to those that support the jury verdict. *See, e.g.,* ¶¶ 33-35 *infra* (¶ 33, parsing Neve's cross-examination to draw the inference that Davis did not loan the $30,000 for repayment of the gambling debt, ¶ 35, characterizing Neve's gambling debt claim as nothing but "insinuation. . . innuendo [and] speculation"). Obviously, the dissent's use of these characterizations reflects that they are nothing more than appellate inferences that are contrary to those drawn by the jury. Moreover, in making its appellate inferences, the dissent does not even acknowledge Neve's specific testimony that: (1) the loan included other obligations "plus the 1500. So this is where the loan got to 30,000;" and, (2) prior to signing the note in the attorney's office, Davis warned Neve not to mention the loan "was going to be used" for "the gambling." Considering this evidence together with Neve's payment of the gambling debt from the loan proceeds and Davis's conceded failure to give Neve credit for his $1,500 payment, there was sufficient evidence to support the jury's verdict both legally and factually.

[¶24.] Ultimately, our cases hold that "gambling contracts often try to take the form of legitimate contracts. It is the duty of the courts to pierce this disguise and to ascertain the real activities involved." *Bayer*, 338 NW2d at 294 (citing *Waite,* 14 SD 626, 86 NW 645). While most of the note in this case concerned non-gambling debts, the jury found that $1,500 was loaned to satisfy the antecedent gambling debt. Because SDCL 53-9-2 unambiguously prohibits enforcement of the entire note if any part of the consideration involved gambling, the result must be

the same whether this suit had been brought to directly enforce the gambling debt, or as in this case, indirectly through enforcement of a note under which the loan proceeds were to be used to repay the gambling debt. In either case the note was void because, under the jury's verdict, part of the consideration for the note was the antecedent gambling debt. Because the jury found that this note was made in partial consideration of the gambling debt, Davis is unable "'*to establish his case without any aid from the illegal transaction*.'" Jasper v. Rossman, 73 SD 222, 226, 41 NW2d 310, 312 (1950) (emphasis added) (citations omitted). *See also Buckman*, 150 Cal at 162, 88 P at 709-10 (concluding that because an action could not have been brought on the original gambling obligation, the "same thing is necessarily true as to any notes given solely in renewal or in place of such original notes"). Although this legislative proscription is harsh in that the majority of the proceeds were used for legal purposes,[3] courts have no constitutional authority to, as the dissent would have it, "modernize"[4] the statute to permit an antecedent gambling debt to serve as part of the consideration for a note.

---

3. Davis has not argued that any part of the legal consideration for the note can be segregated from the illegal portion.

4. The dissent speculates that: "Under the *modern* treatment of certain types of gambling in this State [Deadwood gaming], it is unlikely the Legislature intended that SDCL 53-9-2 be applied as a shield to escape repaying a genuine loan because of an attenuated, separate gambling transaction." *Infra* ¶ 32 (emphasis added). The dissent's "judicial modernization" of the statute would, however, disregard our Constitution's separation of powers. If the statute is to be modernized to permit notes that only partially relate to gambling, that is an exclusive legislative prerogative. Moreover, it is illogical to suggest that one can divine the 1907 Legislature's intent in enacting SDCL 53-9-2 by the 1989 Legislature's authorization of Deadwood gaming. Obviously, the 1907 Legislature could not have known that 82 years later the

(continued . . .)

#24857

[¶25.]     Reversed and remanded for reinstatement of the judgment entered on the jury verdict.

[¶26.]     GILBERTSON, Chief Justice and KONENKAMP, Justice, concur.

[¶27.]     MEIERHENRY, Justice and SABERS, Retired Justice, dissent.


MEIERHENRY, Justice (dissenting).

[¶28.]     I respectfully dissent. We review the circuit court's grant of j.n.o.v. under an abuse of discretion standard. *Martinmaas*, 2000 SD 85, ¶20, 612 NW2d at 606. Applying this standard, the circuit court should be affirmed. The circuit court correctly focused on whether the facts supported a finding that *consideration* for the promissory note was, in part, a gambling debt. The circuit court appropriately applied SDCL 53-9-2 to the facts as presented at trial. In the court's letter decision, the court wrote:

> The consideration for the promissory note was clearly the new money which Neve admits he received. The promissory note does not obligate Neve to repay any money owed for a gambling debt. The fact that Neve used a portion of the money received to repay that debt is irrelevant. It would be unfair and contrary to the law to allow Neve to void his debt by making an attenuated connection to a gambling debt.

I agree with the circuit court's analysis that SDCL 53-9-2 did not apply.

_____

(. . . continued)

1989 Legislature would authorize Deadwood gaming. If anything, the Legislature's 1989 enactment of SDCL 42-7B-47 and 55 confirms that the current legislative intent is to maintain the prohibition on loans made only in partial consideration of gambling debts. When the 1989 Legislature enacted SDCL 42-7B-47 and 55, it specifically referred to and *retained* SDCL 53-9-2 *unmodified*, without adopting the statutory "modernizations" the dissent would make by judicial fiat.

-17-

[¶29.]     SDCL 53-9-2 only voids a note if it was "entered into, where the whole or any part of the *consideration* thereof shall be for money . . . , won or lost, . . . upon any game of any kind, under any name or by any means[.]"  *Id.* (emphasis added). The statute in its entirety provides as follows:

> Any note, bond, or other contract made and entered into, *where the whole or any part of the consideration* thereof shall be for money or other valuable thing, won or lost, laid, staked, or betted at or upon any game of any kind, under any name or by any means; or for the repayment of money or other thing of value, lent or advanced, at the time and for the purpose of any game, play, bet, or wager, or being laid, staked, betted, or wagered thereon shall be absolutely void.

*Id.*  (emphasis added).

[¶30.]     The emphasis in applying this statute should focus on what constitutes "consideration" for the loan.  We have previously said:

> "'Courts do not lend their aid to parties engaged in transactions in violation of law, and betting and gambling contracts are uniformly held to be contrary to the policy of the law and illegal.' *The test to determine whether the plaintiff is entitled to recover . . . is his ability to establish his case without any aid from the illegal transaction.*'"

Jasper v. Rossman, 73 SD 222, 226, 41 NW2d 310, 312 (1950) (emphasis added) (citations omitted).  The test used in applying SDCL 53-9-2 is whether the promissory note was "the product of a gambling transaction."  Bayer v. Burke, 338 NW2d 293, 294 (SD 1983).  In *Bayer*, the plaintiff was trying to collect on a promissory note for $211,730.  The defendant had signed the note after losing $200,000 in bets to the plaintiff.  The plaintiff's argument that consideration was his forbearance from suit on the gambling debts was rejected by this Court.  These cases give guidance in this case to determine whether Neve's prior gambling debt

constituted part of the consideration. In order for Neve to avoid his obligation, he has to show the note was "the product of a gambling transaction." *Id.* If the note stands on its own without the gambling debt, it is not void. *Jasper,* 73 SD at 226, 41 NW2d at 312.

[¶31.]       We should not apply SDCL 53-9-2 with such sweeping breadth that any attenuated wagering between the parties can be used to avoid repaying a legitimate loan. Likewise, we should interpret and apply this statute in light of the current public policy on legalized gambling and the legislature's recognition of the statutes limited application. *See* SDCL 42-7B-47 (not applicable to Deadwood gaming); SDCL 42-7B-55 (not applicable to "authorized gaming and lotteries"). Under the modern treatment of certain types of gambling in this State, it is unlikely the Legislature intended that SDCL 53-9-2 be applied as a shield to escape repaying a genuine loan because of an attenuated, separate gambling transaction.

[¶32.]       Even considering Neve's testimony in a favorable light, he has not shown the note was a product of a gambling transaction or that the loan cannot stand on its own without the gambling debt. Neve admits he received $30,000 of new money that he used to pay outstanding debts owed to a variety of creditors. Neve testified he was in financial trouble with the IRS, had medical bills, truck loans and other "stuff," and that Davis had agreed to help him by loaning him $30,000. Neve testified the $30,000 went to his attorney who used most of the money to pay Neve's bills. Neve said he asked the attorney for $4,000 "because I wanted to pay Don [Davis] off right away on the money that I owed him for gambling." On cross-examination, Neve admitted he was only claiming that "$1,500

was used after the money was given to [him] to pay off a preexisting [gambling] debt." Neve did not testify that Davis loaned him $30,000 in exchange for repayment of the $1,500 gambling debt.

[¶33.] This is not merely a question of who the jury believed – Davis or Neve. Even taking Neve's testimony in the light most favorable to the verdict, the question is whether the evidence supports the requirements of the statute as a matter of law. Neve's attorney in both his opening and closing statements to the jury said that if they found any part of the loan made to Neve "was used to pay a gambling debt," it voided the note. This, of course, is not a correct statement of the law. The gambling debt must be part of the consideration.

[¶34.] Neve's only evidence to support his claim it was part of the consideration was that he repaid the prior $1,500 gambling debt from the proceeds of the $30,000, and that Davis told him not to mention the gambling debt to the lawyer. The rest of Neve's argument that the gambling debt constituted consideration for the note was based on insinuation and innuendo. He argues consideration can be gleaned from Davis' alleged "disguise and artifice" and that Davis only loaned Neve the additional $30,000 in an attempt to get the gambling debt paid out of the proceeds and then get paid again. This argument is based more on speculation than any evidence presented at trial. Notably, Neve *did not* testify that Davis required repayment of the $1,500 as part of the loan. A verdict cannot be based on speculation or guesswork. *See cf*. Von Sternberg v. Caffee, 2005 SD 14, ¶18, 692 NW2d 549, 555 (citing jury instructions that prohibit rendering a verdict based on speculation or guesswork).

[¶35.]     If, as Neve claimed, he used $1,500 to pay off his prior gambling debt, he still was obligated to repay the entire $30,000 under the promissory note.  Thus, based on the facts as Neve has presented them, the gambling debt was not the product of the promissory note and loan.  Consequently, the circuit court properly recognized the gambling debt was too attenuated to be deemed part of the consideration for the loan.  I would hold that the circuit court properly interpreted and applied the law to the facts as presented by Neve and did not abuse its discretion in granting a j.n.o.v.

[¶36.]     SABERS, Retired Justice, joins this dissent.