#25162-a-DG

**2009 SD 108**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DELLAS COLE and MARGIE COLE,                    Plaintiffs and Appellants,

  v.

WELLMARK OF SOUTH DAKOTA, INC.
and DELLA TSCHETTER INSURANCE,                  Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

* * * *

HONORABLE DAVID R. GIENAPP
Judge

* * * *

N. DEAN NASSER, JR. of
Nasser Law Offices, PC                   Attorneys for plaintiffs
Sioux Falls, South Dakota                and appellants.

JUSTIN G. SMITH
KRISTINE L. KREITER O'CONNELL of
Woods, Fuller, Shultz and Smith, PC
Sioux Falls, South Dakota                Attorneys for defendant
                                         and appellee Wellmark.

TIMOTHY M. GEBHART
THOMAS M. FRANKMAN of
Davenport, Evans, Hurwitz and Smith, LLP
Sioux Falls, South Dakota                Attorneys for defendant
                                         and appellee Della Tschetter
                                         Insurance.

* * * *

ARGUED OCTOBER 7, 2009

OPINION FILED **12/09/09**

#25162

GILBERTSON, Chief Justice

[¶1.]        Dellas Cole (Dellas) and Margie Cole (Margie) submitted an application for health insurance coverage to Wellmark of South Dakota, Inc. (Wellmark).  Della Tschetter (Tschetter), an independent insurance agent, assisted Coles with the application process.  Wellmark claimed it mailed riders for exclusions to Coles at their home address.  It further claimed it denied Coles' application when they failed to return signed riders as requested by Wellmark.  Coles claimed they did not receive the riders, rejection notice, or the premium refund.  After their daughter was injured, Coles discovered they had not been approved and sued Wellmark and Tschetter claiming each had a duty under tort or contract to provide the coverage.  The trial court dismissed the matter on Defendants' motions for summary judgment.  Coles appeal.  We affirm.

**FACTS**

[¶2.]        In September 2003, Dellas and Margie Cole contacted Della Tschetter Insurance to obtain quotes for health insurance for their family.  Margie's employment change in August required the family to purchase a new policy or enroll for COBRA coverage with her previous employer by September 31, 2003, in order to avoid a lapse in coverage.  Tschetter's agency was one of three the Coles contacted.  Tschetter dropped off information at the Coles' home the same day she spoke over the telephone with Margie.  Due to Tschetter's prompt service, the Coles decided to work with her on obtaining health insurance coverage.

-1-

#25162

[¶3.]      The Coles decided to apply to Wellmark.[1]  They were motivated to select Wellmark because of their ability under "Option 1" of its individual plan to select the effective date of the policy in exchange for paying the first month's premium at the time the application was submitted.  Coles determined that "Option 2," wherein Wellmark would assign an effective date, was not something that would suit their timeline.

[¶4.]      On September 10, 2003, Tschetter met with the Coles who had completed most of their application form prior to the meeting.  Tschetter helped them finalize their application and answered their questions.  Tschetter informed the Coles that their youngest son's allergies would probably be considered a preexisting condition for which a rider (exclusion) would be issued.  The application stated immediately above the signature line:

> **COVERAGE APPLIED FOR WILL NOT BE EFFECTIVE UNTIL WELLMARK OR USAL, AS THE UNDERWRITERS OF THE HEALTH AND LIFE COVERAGES, RESPECTIVELY, HAVE REVIEWED AND APPROVED THIS APPLICATION AND NOTIFIED ME IN WRITING OF THE APPROVAL OF SUCH INSURER'S COVERAGE. WELLMARK UNDERWRITES COVERAGE UP TO THE EFFECTIVE DATE OF THE POLICY REGARDLESS OF WHEN THE APPLICATION WAS APPROVED.** Any payment will be deposited immediately upon Wellmark's receipt of this application. Should my application not be approved, my payment will be refunded in full.

(Bolding, underlining, and all capitals in original).  The Coles both signed and dated the form on the signature lines immediately below these statements.

---

1.      Coles also received Wellmark quotes from at least one other local agent but decided to work with Tschetter.

[¶5.]        Coles selected October 1, 2003, as the effective date for coverage and noted this on their application.  As the meeting wrapped up, Tschetter said that the Coles were "all set," and "good to go."  The application, a check for $567.00 for the first month's premium, and an authorization form for Wellmark to electronically deduct premiums from Coles' checking account for subsequent monthly premiums were mailed by Tschetter to Wellmark.

[¶6.]        Wellmark received the application on September 15, 2003, and immediately cashed the Coles' check.  Wellmark claimed it attempted to contact the Coles by letter dated September 18, 2003, to advise them that two riders would be issued on their proposed policy.  In that letter, Wellmark claimed it requested their signatures on the riders before the policy would issue.  When Wellmark did not receive the signed riders, it claimed it sent a letter dated October 24, 2003, advising Coles that their application had been rejected.  The Coles claimed they never received either letter.

[¶7.]        Tschetter claimed she also attempted to contact the Coles by telephone to inquire as to why they had not signed and returned the riders.  Tschetter later testified that she left two messages on Coles' answering machine.  Coles testified they never received the messages.  Tschetter further testified she assumed the Coles had decided to use one of the other local agents Coles had been in contact with before electing to work with Tschetter, and had procured coverage with another insurer.

[¶8.]        On November 4, 2003, Wellmark issued a refund check to the Coles for the $567.00 premium payment.  Coles claimed they did not receive the refund

check.[2] Coles also testified they never received an approval letter, insurance cards, or any notice they were insured. They further testified premiums for November and December were not deducted from their checking account.

[¶9.]    On November 9, 2003, Coles' daughter suffered a knee injury. On December 2, 2003, medical care was sought. It was then that Margie contacted Tschetter to inquire about the insurance policy. Tschetter informed Margie that the policy was never issued due to the Coles' failure to sign and return the riders. Coles incurred $20,000.00 in medical expenses for their daughter's knee surgery. A suit was filed against Wellmark and Tschetter for breach of contract, negligent misrepresentation, estoppel, reformation, waiver, and breach of fiduciary duty in an effort to obtain the coverage with an effective date of October 1, 2003.

[¶10.]    During his deposition, Dellas testified as to what he understood the language, as reprinted in paragraph four above, meant regarding when coverage would be in effect:

> Q.    As you sit here today, what does that sentence mean?
> A.    It means that what is discussed in this application form, that the insurance we applied for with this application does not kick in, is not effective, until they notify us, until we receive something in the mail, they notify us in writing.
> Q.    So the approval of your application and the issuance of coverage, according to this sentence, is subject to review by Wellmark, is that how you read it?
> A.    Yes.
> Q.    What did you think that meant when you were filling out the application and when you signed it?

---

2.    A second refund check was issued on March 10, 2004, which was received by the Coles who allowed the check to expire without cashing it. Coles eventually cashed a second replacement check.

> A. It would mean that they would review our application and then act upon it.
>
> Q. And how would they act upon it?
>
> A. Approve or whatever, whatever they do.
>
> . . .
>
> Q. At the time you were meeting with Della Tschetter to discuss this application and fill it out, and when you signed the application, did you understand the application was subject to approval by Wellmark?
>
> A. Yes.

[¶11.] Wellmark and Tschetter each filed separate motions for summary judgment in which they both argued no duty existed under tort or contract to provide the coverage. The trial court granted Wellmark and Tschetter's respective motions for summary judgment and the case was dismissed. The Coles appeal raising the following issue:

> Whether Wellmark or Tschetter had a duty under tort or contract law to provide the requested coverage.

## STANDARD OF REVIEW

> Our standard of review on summary judgment requires this Court to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment on the merits as a matter of law. The circuit court's conclusions of law are reviewed de novo. However, all facts and favorable inferences from those facts must be viewed in a light most favorable to the nonmoving party. We will affirm the circuit court's ruling on a motion for summary judgment when any basis exists to support its ruling.

Dakota Plains Ag Ctr., L.L.C. v. Smithey, 2009 SD 78, ¶14, 772 NW2d 170, 178 (quoting Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶16, 714 NW2d 884, 891) (internal citations omitted). "Questions of legal duty are issues of law reviewed de novo." A.M. Farms v. County of Codington, 2009 SD 28, ¶6, 765 NW2d 550, 553 (citing Bordeaux v. Shannon County Sch., 2005 SD 117, ¶11, 707 NW2d 123, 126).

Generally, negligence claims are not suited for disposition under a motion for summary judgment. Kuehl v. Horner Lumber Co., 2004 SD 48, ¶10, 678 NW2d 809, 812. However, if the duty question can be resolved in the defendant's favor then a motion for summary judgment may be properly granted. *Id*.

### 1. *Claims against Wellmark*

[¶12.] Coles argue that the application form created a contract for interim health coverage effective October 1, 2003, that continued until either Wellmark approved Coles' application and issued a policy or Wellmark rejected Coles' application. Coles also argue Tschetter, as an agent of Wellmark cloaked with authority to approve applications gave verbal approval for coverage effective October 1, 2003.

### a. *Contract for interim coverage*

[¶13.] Coles argue that an implied contract for interim coverage existed between them and Wellmark. Coles argue that the language **"WELLMARK UNDERWRITES COVERAGE UP TO THE EFFECTIVE DATE OF THE POLICY REGARDLESS OF WHEN THE APPLICATION WAS APPROVED,"** along with the payment of the first month's premium created an implied contract for interim insurance between October 1, 2003, and the time Wellmark acted upon Coles' application. In order to arrive at this result, Coles ask this Court to read the following language, **"WELLMARK UNDERWRITES COVERAGE UP TO THE EFFECTIVE DATE OF THE POLICY REGARDLESS OF WHEN THE APPLICATION WAS APPROVED,"** contained in the application immediately

above the signature lines in isolation and out of context with the rest of that paragraph, which provides:

> **COVERAGE APPLIED FOR WILL NOT BE EFFECTIVE UNTIL WELLMARK OR USAL, AS THE UNDERWRITERS OF THE HEALTH AND LIFE COVERAGES, RESPECTIVELY, HAVE REVIEWED AND APPROVED THIS APPLICATION AND NOTIFIED ME IN WRITING OF THE APPROVAL OF SUCH INSURER'S COVERAGE.**

[¶14.]     "[T]he scope of coverage of an insurance policy is determined from the contractual intent and the objectives of the parties as expressed in the contract." St. Paul Fire and Marine Ins. Co. v. Schilling, 520 NW2d 884, 887 (SD 1994) (citing City of Fort Pierre v. United Fire & Cas. Co., 463 NW2d 845, 848 (SD 1990); Black Hills Kennel Club, Inc. v. Fireman's Fund Indem. Co., 77 SD 503, 94 NW2d 90 (1959)). We construe a contract of insurance giving words their plain and ordinary meaning. *Id.* We will not resort to rules of construction, including the rule that requires language to be construed liberally in favor of the insured and strictly against an insurer, unless the language of the contract is ambiguous. *Id.* We will not create a forced construction or a new contract for the parties when the language is clear and we are able to ascertain the plain and ordinary meaning of the language used. *Id.*

[¶15.]     Furthermore, "[a] proposed insured is deemed to have known the contents of the application and cannot disregard any limitations that are contained in the application." Worden v. Farmers State Co., Inc., 349 NW2d 37, 41 (SD 1984) (citing Cavallo v. Met. Life Ins. Co., 34 AD2d 682, 312 NYS2d 438 (1970)). An insurance policy for which the application provides that liability will not attach until the application is approved and the first premium is paid cannot take effect

#25162

until both events occur. *Id.* (citing Bowen v. Mut. Life Ins. Co., 20 SD 103, 104 NW 1040, 1044 (1905)). In addition, the limiting language in an application for insurance will supersede any statements made by an agent as to when coverage will become effective as such statements are mere expressions of an opinion. *Id.*

[¶16.] In order to find a contract of interim coverage existed under these facts, Coles urge this Court to conclude that the language contained in the contract that **"WELLMARK UNDERWRITES COVERAGE UP TO THE EFFECTIVE DATE OF THE POLICY REGARDLESS OF WHEN THE APPLICATION WAS APPROVED,"** is ambiguous and created such a contract. Coles offer a definition of the word "underwrites" from the Merriam-Webster Dictionary: "2. to set one's name to (an insurance policy for the purpose of thereby becoming answerable for a designated loss or damage on consideration of receiving a premium percent): insure on life or property; *also*: to assume liability for (a sum or risk) as an insurer[.]" Coles argue that the use of the term "UNDERWRITES" in the sentence above shows that Wellmark accepted liability on the policy for which the Coles applied on the effective date they selected. Acceptance, according to Coles, committed Wellmark to a contract for interim health coverage effective October 1, 2003, and until Wellmark either approved Coles' application and issued a regular policy, or it rejected their application. However, Wellmark argues the sentence contains a condition precedent that required Wellmark to approve the policy in writing *before* coverage would relate back to the effective date Coles selected.

[¶17.] Coles testified that they did not read the contract thoroughly before signing it. Despite this statement, Dellas also testified he understood the language

that appeared immediately above the signature line to mean that coverage would not be in effect until Wellmark approved the policy and notified Coles in writing. He then testified that he also understood the language in the contract that **"WELLMARK UNDERWRITES COVERAGE UP TO THE EFFECTIVE DATE OF THE POLICY REGARDLESS OF WHEN THE APPLICATION WAS APPROVED,"** meant Wellmark would provide interim coverage.

[¶18.]    However, there is no ambiguity in the policy application's language that coverage would be effective only when written approval from Wellmark was received by Coles. Coles' understanding that interim coverage was provided under the application cannot defeat the plain language of the provision that only written notification would suffice for coverage to be effective. Furthermore, Coles offered nothing in writing from Wellmark that indicated its approval of the alleged interim coverage was in effect as of the date Coles signed the application.[3] Regardless of

---

3.    It their brief, Coles argue Dellas' testimony indicated he understood the meaning of the language above the signature line at the time his deposition was taken, but did not have that same level of understanding when he signed the contract. Coles also argued that all the writings, meaning the application form, the electronic funds transfer form for premium payments, and their check, must be considered as the writings that approved the interim coverage. However, neither of these arguments have support in the testimony offered by Coles. "A party may not claim a better version of the facts on appeal than claimed below[.]" Matter of SDDS, Inc., 472 NW2d 502, 511 (SD 1991) (citing Garrett v. BankWest, Inc., 459 NW2d 833, 838 (SD 1990)). Dellas was asked whether he understood the meaning of the language at the time of the deposition and he replied that he did. He was then asked whether he understood at the time he signed the contract what the language meant and he replied that he did. Coles cannot deny that testimony on appeal. Furthermore, no reference to the application, check, and funds transfer form was made during their depositions suggesting that Coles considered these documents, when read together, as written approval of interim coverage from Wellmark at the time the application was submitted.

how Coles internally interpreted the unambiguous terms of the application, they were bound to it based on their signatures indicating agreement with and acceptance of the terms.

[¶19.]     We will not engage in a tortured reading of the Wellmark application in order to create ambiguity and disregard the clear language that Wellmark would not provide any coverage until it or USAL had "reviewed and approved [Coles] application and notified [Coles] in writing of the approval of [Wellmark's] coverage." Coles' attempt to rewrite the language of the application in order to obtain interim coverage fails. We will not rewrite clear and unambiguous terms in an application for insurance to find coverage where none existed. The triggering point for the policy to become effective and for coverage to relate back to October 1, 2003, was approval by Wellmark or USAL, and receipt of written notice of that approval by Coles. Neither condition was ever satisfied.

[¶20.]     The statutory prohibition on such interim coverage is also fatal to Coles' argument. The provisions of SDCL 58-11-32 preclude insurers from offering temporary or interim health insurance under the binder provisions found in SDCL 58-11-29 through 58-11-31.[4] SDCL 58-11-32 provides: "Sections 58-11-29 to 58-11-

---

4.     SDCL 58-11-30 provides: No binder shall be valid beyond the issuance of the policy with respect to which it was given, or beyond ninety days from its effective date, whichever period is the shorter.

SDCL 58-11-31 provides: If the policy has not been issued a binder may be extended or renewed beyond such ninety days with the written approval of the director, or in accordance with such rules and regulations relative thereto as the director may promulgate.

31, inclusive, *shall not* apply to life or health insurances." (Emphasis added).

SDCL 58-11-29 provides in relevant part:

> Binders or other contracts for temporary insurance may be made orally or in writing, and shall be deemed to include all the usual terms of the policy as to which the binder was given together with such applicable endorsements as are designated in the binder, except as superseded by the clear and express terms of the binder.

[¶21.]     As this Court has often noted, "[s]tatutory interpretation is a question of law to be reviewed under the de novo standard of review."  Discover Bank v. Stanley, 2008 SD 111, ¶15, 757 NW2d 756, 761 (citing Martinmaas v. Engelmann, 2000 SD 85, ¶49, 612 NW2d 600, 611).  Furthermore,

> The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute.  The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used.  Words and phrases in a statute must be given their plain meaning and effect.  When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed.

*Id.*

[¶22.]     SDCL 58-1-3.1 provides that the Insurance Code applies to all entities transacting the business of insurance within the State of South Dakota with some exceptions contained in SDCL 58-1-3, which are inapplicable to the facts of this case.  The Insurance Code applies "when the business transacted includes benefits for medical, surgical, or hospital care, whether the coverage is by direct payment, reimbursement, or otherwise."  SDCL 58-1-3.1.  SDCL 58-1-4 provides that: "Provisions of this title relative to a particular kind of insurance or a

particular type of insurer or to a particular matter shall prevail over provisions relating to insurance in general or insurers in general or to such matter in general."

[¶23.] Reading SDCL 58-1-3.1 and SDCL 58-1-4 together with the provisions of SDCL 58-11-32 we can come to but one conclusion: The Insurance Code prohibits an insurer from offering interim health insurance within the state of South Dakota. Despite Coles' attempt to suggest otherwise, interim health insurance is not authorized under the Insurance Code. Furthermore, "[i]t is the general rule that a contract [that] is contrary to statutory or constitutional law is invalid and unenforceable." Willers v. Wettestad, 510 NW2d 676, 680 (SD 1994) (citing Waara v. Kane, 269 NW2d 395 (SD 1978); Hieb v. Opp, 458 NW2d 797 (SD 1990)). As such, Coles' attempt to gain coverage under a theory that an implied contract for interim coverage existed fails under both arguments advanced by Coles. There was no contractual duty running from Wellmark to Coles under the argument that a contract for interim health coverage existed between the parties.

### b. *Tschetter as an agent with authority to bind Wellmark*

[¶24.] Next, Coles argue Tschetter had ostensible authority to bind Wellmark with her actions and statements. They further argue Tschetter's statements that Coles were "all set," and "good to go," constituted a verbal approval of coverage on behalf of Wellmark. Based on these statements, Coles argue Wellmark, through its agent Tschetter, gave verbal approval of the coverage.

[¶25.] The trial court, without addressing the issue of whether Wellmark's conduct created apparent or ostensible authority in Tschetter to bind it, concluded no duty existed on the part of Wellmark as a consequence

of Coles submitting their application. In rendering its decision, the trial court focused on the Coles' deposition testimony that they signed the form, which bound them to the terms of the application including the language describing when coverage would be in effect. The trial court also found Tschetter's comments that Coles were "all set," and "good to go," were either Tschetter's opinion or referred to the completion of the application. It further found Tschetter's statements did not constitute approval of the application by Tschetter as Wellmark's agent.

[¶26.] Based upon this Court's holding in *Worden*, 349 NW2d at 41, we agree with the trial court that Tschetter's words were at best an expression of her opinion and not verbal approval of the policy on behalf of Wellmark. Coles also have acknowledged in their brief that the holding in *Worden* generally precludes their argument. However, they argue there was much more here than Tschetter's words to show authority. Coles offer the fact that Wellmark provided Tschetter with preprinted forms, marketing materials, and the ability to select an effective date for coverage under "Option 1" as evidence of Wellmark cloaking Tschetter with authority to verbally approve policies.

[¶27.] Even if we were to assume such apparent or ostensible authority existed, Wellmark argues that it and Tschetter had no duty or obligation to Coles based on the terms of the application. It bases its argument on the language in the application form immediately above the signature line, which it contends indicates the document was not an offer of insurance by Wellmark. It further argues the language made it clear coverage would be in effect only when two conditions were

satisfied: either Wellmark or its underwriter USAL approved the coverage, *and* *written notice* of that approval was provided to Coles. Because neither condition was satisfied, coverage never took effect.

[¶28.] We agree with Wellmark that even if we were to find that Tschetter's ambiguous comments constituted verbal approval by Wellmark under an agency theory, the second required condition for coverage to be in effect was never met. That is, no *written* approval of Coles' application was ever received by Coles from either Tschetter or Wellmark. Thus, Coles' argument that coverage was in effect due to Tschetter's verbal approval fails.

[¶29.] We previously so held in a factually similar case in *Kent v. Assoc. Life Ins. Co.*, 84 SD 8, 166 NW2d 429 (1969). As noted above, Coles point to the following facts to support their claim of authority: Wellmark provided Tschetter with preprinted application forms, Wellmark permitted Tschetter to select an effective date under "Option 1," and the line in the application form that stated **"WELLMARK UNDERWRITES COVERAGE UP TO THE EFFECTIVE DATE OF THE POLICY REGARDLESS OF WHEN THE APPLICATION WAS APPROVED."** The facts in the instant case go no further than the facts in *Kent*. They are insufficient to show that Wellmark cloaked Tschetter with authority to approve coverage. As the *Kent* Court held, these facts are not sufficient to show the agent had authority to verbally approve coverage. *Id.* In the instant case, Tschetter was an insurance agent authorized to solicit applications but without authority to bind Wellmark upon her verbal approval.

[¶30.] Coles argue Tschetter was Wellmark to them and authorized by Wellmark to approve coverage. However, the undisputed fact remains that Coles signed the application and in doing so agreed to all the terms and conditions within that application. Included in those terms, was the statement that the policy would not go into effect until it was approved by Wellmark *and* written notice was received by Coles. In addition, there was nothing contained in the preprinted forms that indicated Tschetter had authority to verbally approve coverage. Thus, there was no duty running from Wellmark to Coles based on Tschetter's "all set," and "good to go" comments.

**2.** ***Negligence claims against Tschetter Insurance in its capacity as Coles' Agent***

[¶31.] Coles argue Tschetter was their agent and owed them a duty as an insurance professional to procure the requested coverage. They further argue Tschetter had a duty to timely notify Coles of her failure to procure the requested insurance. In addition, Coles argue Tschetter had a duty to give notice to Coles of cancellation of what they assert was interim coverage. Finally, Coles argue Tschetter had a duty to timely notify them that the insurance coverage had been cancelled.

**A.** ***Duty to procure***

[¶32.] Before the law will impose liability under a theory of negligence, there must be a duty owed by the defendant to protect the plaintiff from injury. *Kuehl*, 2004 SD 48, ¶10, 678 NW2d at 812. A duty can arise under statute or common law. *Id*.

[¶33.]     Coles allege Tschetter had a duty under SDCL 58-30-106(6) and (7). However, SDCL 58-30-106 and all its subsections were repealed in 2001 two years before the facts of this case arose. 2001 Sess. Laws ch 286, §§ 279 to 281. As such, Coles' argument that a duty existed by statute fails.

[¶34.]     Next, Coles allege Tschetter owed them a duty under common law as an insurance agent. An insurance agent has a duty to a potential insured to "procur[e] insurance of the kind and with the provisions specified by the insured." City of Colton v. Schwebach, 1997 SD 4, ¶10, 557 NW2d 769, 771 (citing Fleming v. Torrey, 273 NW2d 169, 170 (SD 1978)). The duty owed to a potential insured by an insurance agent asked to procure a particular type of insurance by the insured is to use reasonable diligence to get the insurance specified, or to seasonably notify the potential insured of the agent's inability to do so. Feldmeyer v. Englehart, 54 SD 81, 222 NW 598, 599 (1928) (quoting Russell v. O'Connor, 120 Minn 66, 139 NW 148 (1912)). The same duty to procure arises when the potential insured asks an agent to conduct a review of coverage and make a recommendation. *City of Colton*, 1997 SD 4, ¶10-11, 557 NW2d at 771. In such instances, the agent has a duty to procure the coverage the agent recommended after conducting the review. *Id.*

[¶35.]     At issue is whether Tschetter's duty to obey Coles' instructions with regard to submitting the Wellmark application included a duty to procure the insurance or a duty to notify Coles that the insurance could not be procured. Coles suggest Tschetter had a duty to procure the insurance and a duty to notify them that Wellmark had not approved their coverage for failure to sign and return the riders. Coles appear to argue Tschetter's duty was to procure the coverage

regardless of any obstacles she may have encountered, including the failure of Coles to sign and return the riders issued by Wellmark.

[¶36.]    Tschetter was asked to assist Coles by providing information about various insurers from which Coles could select health insurance for their family that could be in effect no later than October 1, 2003. Tschetter presented several options and suggested Coles consider purchasing the COBRA coverage Margie was guaranteed through her previous employer. Coles selected Wellmark as the only insurer to which they wanted to apply for coverage based on cost and the ability to select an effective date of October 1, 2003. Coles rejected other insurers suggested due to price, and told Tschetter they did not want to enroll in the COBRA coverage due to the cost. Tschetter assisted them with filling out the application and mailed it to Wellmark along with the first month's premium and authorization form for the automatic deduction of future premium payments from Coles' checking account. Coles provided no direction to Tschetter other than to file the appropriate materials necessary for Wellmark to evaluate their application. After Coles signed the application and acknowledged written approval would be made by Wellmark, they did not ask for further clarification or assistance from Tschetter. Coles did not ask Tschetter to monitor the progress of their application or to provide additional information in the event Wellmark required a rider for their son's allergies. Given that Coles did not ask Tschetter to conduct a review and make a recommendation and then obtain the insurance she recommended, there was no duty created to obtain the insurance or seasonably notify Coles of her inability to obtain the coverage. This is especially apparent given that Tschetter would not be "obtaining"

the insurance for Coles, but rather after the submission of the application by Tschetter Wellmark would be communicating directly with Coles as to whether or not they were approved for coverage.

[¶37.] Coles suggest that Tschetter was responsible for notifying them of the need to sign the riders. Coles provided no such direction to Tschetter at the time she expressed her opinion that Wellmark would likely require a rider for their son's allergies. Tschetter made it clear to the Coles that Wellmark would require at least one rider, and to watch their mail for correspondence from Wellmark. Coles asked no further questions regarding the rider.

[¶38.] Furthermore, the duty as outlined in *Feldmeyer* is to seasonably notify a potential insured that the policy cannot be obtained. 54 SD 81, 222 NW at 599. In the instant case, the insurance could have been procured conditioned on Wellmark's requirement that the Coles' sign and return the riders. Coles have offered no authority for the proposition that an agent has a duty after the agent has submitted the application on behalf of the potential insured to advise the potential insured that the policy will issue if, an only if, the potential insured takes some additional action specified by the insurer and communicated to the potential insured by the insurer but not to the agent. We can find no authority in our case law that would permit us to place such an onerous duty upon an agent and relieve a potential insured from complying with the formalities of entering into a contract of insurance.

[¶39.] Furthermore, as noted above, Coles read and signed the application. Margie testified that she only skimmed the application and did not read the quoted

language indicating coverage would not be in effect until either Wellmark or USAL approved the coverage and issued written approval. Dellas testified that he did not read the quoted language in full. However, he also testified he understood that until they received written confirmation from Wellmark the coverage would not be effective.[5] Coles gave no indication at the time they met with Tschetter that they did not understand that the approval would come from Wellmark directly. They did not direct Tschetter to do anything else other than submit the application. Coles also did not direct Tschetter to contact them in the event Wellmark did not approve their application.

[¶40.]     Coles asked Tschetter to submit their application to Wellmark, which she did. Coles never asked Tschetter to guarantee Wellmark would grant the coverage, although on appeal that appears to be the nature of Coles' claims against Tschetter. Nor did Coles ask Tschetter to monitor correspondence between Wellmark and Coles. Tschetter did all she was asked to do by Coles as their agent at the time the parties met.

[¶41.]     Coles cite to *Coyne & Delany Co. v. Selman*, 98 F3d 1457, n15 (4thCir 1996), for the proposition that an insurance agent "may be held liable where he has breached a contract to procure insurance for his principal." However, in the instant case, Coles have not shown facts in the record to support the existence of a contract between them and Tschetter for her to procure health insurance coverage. In

---

5.     Coles also argue to them Tschetter was Wellmark. Even if this Court were to accept Coles' argument and hold that Tschetter and Wellmark were one and the same, the fact remains that no written approval of the coverage was received by Coles from Tschetter or from Wellmark. *See supra* ¶¶ 24-30.

*Delany*, the insurance agency was in the business of writing policies, selling, and procuring coverage using reinsurers in order to meet its customers' orders. 98 F3d at 1460. In the instant case, Coles understood that Tschetter was one of several agents who could assist them with obtaining a Wellmark policy. Coles did not ask Tschetter to design a plan to suit Coles' insurance needs. Coles also rejected Tschetter's advice that Margie's COBRA insurance might be their best option due to their son's preexisting condition. Despite this advice, Coles retained all control over the specifics of the selection of a policy including the premiums, the deductible, and the effective date of coverage and determined that they would prefer the Wellmark policy due to price.

[¶42.]    Tschetter was an agent authorized by Wellmark to submit applications on behalf of potential insureds who wished to apply for Wellmark coverage. If Coles wanted to create a contract between them and Tschetter for procurement of health insurance coverage, they failed to do so. As such, she had no duty beyond that contained in *City of Colton*, 1997 SD 4, ¶10, 557 NW2d at 771, "to obey client's instructions in good faith and with reasonable professional skill," which in this case was to submit Coles' Wellmark application. We also agree with the trial court that under *Worden* there was no duty on the part of Tschetter to procure the insurance as claimed by Coles. We can find no duty on the part of Tschetter to take any additional steps to cause Wellmark to act upon Coles' application.

**b.    *Duty to notify***

[¶43.]    Tschetter testified that she left a message on Coles' home answering machine advising them that the riders had not been signed and returned as

required for coverage to begin. Coles conceded in their testimony that they could not state for certain that such a message was not left. Accepting the facts in the light most favorable to Coles, and assuming that no such message was left, Tschetter's duty did not extend to that type of activity. Tschetter was asked to identify insurance providers and assist Coles with the application process. Tschetter advised Coles they would need to watch their mail for the allergy rider, sign, and return it to Wellmark. Coles appeared to understand the rider issue, did not request any clarification, did not ask Tschetter to monitor the rider situation on their behalf, and did not ask her to notify them if Wellmark required riders on the policy.

[¶44.]      Coles second argument, that Tschetter failed to notify them that the insurance coverage had been cancelled, also fails. The argument assumes that coverage was approved and a policy issued. There are no facts in the record to suggest the coverage was ever in effect, and therefore, ever cancelled. Furthermore, Coles concede that Wellmark never issued a policy. (Appellant's Brief 23). The same is true for Coles' argument that Tschetter had a duty to notify them that their alleged interim coverage was cancelled, which fails because no such interim policy existed. *See* ¶¶13-23 for discussion.

**c.    *Existence of a fiduciary duty***

[¶45.]      Coles next ask this Court to consider imposing a fiduciary duty on insurance agents who solicit applications for insurance. The trial court rejected Coles' assertion that a fiduciary relationship existed between Tschetter and Coles.

[¶46.]     The existence of a fiduciary relationship is an issue of law.  Cleveland v. BDL Enter., Inc., 2003 SD 54, ¶18, 663 NW2d 212, 218.  A fiduciary relationship requires one to have, in addition to "'confidence of the one in the other,'" the existence of "'a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, *giving to one advantage over the other.*'"  Garrett v. BankWest, Inc., 459 NW2d 833, 838 (SD 1990) (quoting Yuster v. Keefe, 46 IndApp 460, 466, 90 NE 920 (1910)) (emphasis original).  As such, South Dakota law reflects that most commercial or business relationships do not rise to the level of a fiduciary relationship when the parties are dealing over an arms-length transaction.  High Plains Genetics Research, Inc. v. J K Mill-Iron Ranch, 535 NW2d 839, 842 (SD 1995) (citing Taggart v. Ford Motor Credit Co., 462 NW2d 493, 500 (SD 1990)).

[¶47.]     Coles entered into an arms-length transaction for the purchase of health insurance.  They testified that they had in the past reviewed and selected health insurance plans through Margie's employer.  They also testified that they had considered and rejected health insurance through Dellas's employer.  Coles researched and reviewed several other policies, including policies offered through State Farm.  Coles determined these other plans were more expensive than the Wellmark plan.  They did so without demonstrating "any weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other," as compared to the agents and benefits managers they interviewed.  There is nothing in the record to suggest the existence of a fiduciary relationship between Tschetter and Coles.

**CONCLUSION**

[¶48.] There was no duty in contract or tort running from Wellmark or Tschetter to Coles under any of the numerous theories advanced by Coles. Absent a legal duty, the matter was properly dismissed on Defendants' motions for summary judgment. Affirmed.

[¶49.] KONENKAMP, ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.